# 25-2639-cv

## United States Court of Appeals

### for the

### Second Circuit

CADARET, GRANT & CO., INC.,

*Plaintiff-Appellant,*

– v. –

GREAT AMERICAN INSURANCE COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

MICHAEL A. GRAZIANO
ECKERT, SEAMANS, CHERIN
  & MELLOTT, LLC
1717 Pennsylvania Avenue, NW,
  12th Floor
Washington, DC 20006
(202) 659-6600

RIYAZ G. BHIMANI
ECKERT, SEAMANS, CHERIN
  & MELLOTT, LLC
10 Bank Street, Suite 700
White Plains, New York 10606
(914) 949-2909

*Attorneys for Defendant-Appellee*

CP COUNSEL PRESS   (800) 4-APPEAL • (391725)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1(a) and 28(a)(1) of the Federal Rules of Appellate Procedure, Great American Insurance Company ("Great American") states that it is a wholly-owned subsidiary of American Financial Group, Inc., which is a publicly-traded corporation incorporated in Ohio and trading on the New York Stock Exchange under the symbol "AFG."

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF THE ISSUES............................................................................7

STATEMENT OF THE CASE.................................................................................9

    I.     The Financial Institution Bond.................................................................9

    II.    Cadaret's Pre-Bond Discovery of Pagartanis's Scheme .....................11

    III.   The Bond Claim ......................................................................................14

SUMMARY OF THE ARGUMENT ....................................................................17

ARGUMENT ........................................................................................................18

    I.     The District Court Was Correct in Holding that the Bond Does Not Cover the Settlement Payments .........................................18

        A.    Binding Precedent Forecloses Cadaret's Claims......................18

        B.    Unambiguous Bond Provisions Preclude Coverage from Attaching to Cadaret's Liability to Third Parties.............20

            1.    Cadaret Did Not Sustain a Direct Loss..........................22

            2.    Cadaret Cannot Satisfy the Manifest Intent Requirement......................................................................34

            3.    The Stolen Funds Were Not Covered Property.............39

            4.    The Bond Excludes Damages for which Cadaret is Liable.............................................................43

            5.    The Bond Excludes Losses from Customer Accounts Except Direct Embezzlement ........................45

    II.    The Judgment Is Supported by Alternative Grounds..........................47

        A.    Coverage for Pagartanis Terminated Immediately upon Inception of the Bond.......................................................47

        B.    Cadaret Discovered the Loss Before the Bond Period .............50

C.     Cadaret Failed to Comply with Section 5 of the Bond ............. 53

D.     Cadaret's Complaint Is Time-Barred ....................................... 53

CONCLUSION ................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*175 E. 74th Corp. v. Hartford Acc. & Indem. Co.*,
416 N.E.2d 584 (N.Y. 1980)................................................................ *passim*

*Aetna Cas. & Sur. Co. v. Kidder Peabody & Co. Inc.*,
246 A.D.2d 202 (N.Y. App. Div. 1998) ........................................ *passim*

*C. Douglas Wilson & Co. v. Ins. Co. of N. Am.*,
590 F.2d 1275 (4th Cir. 1979).................................................................48

*Cap. Bank & Tr. Co. v. Gulf Ins. Co.*,
91 A.D.3d 1251 (N.Y. App. Div. 2012) ............................... 6, 47, 48, 50

*Cent. Nat. Ins. Co., of Omaha v. Ins. Co. of N. Am.*,
522 N.W.2d 39 (Iowa 1994) ...................................................................24

*Certain Underwriters at Lloyd's, London v. Essex Glob. Trading, Inc.*,
147 A.D.3d 595 (N.Y. App. Div. 2017) .................................................22

*Citibank Tex., N.A. v. Progressive Cas. Ins. Co.*,
522 F.3d 591 (5th Cir. 2008)..................................................................22

*Citizens Bank, N.A. v. Kan. Bankers Sur. Co.*,
2007 Kan. App. Unpub. LEXIS 524 (Kan. Ct. App. Jan. 5, 2007) ......................22

*Citizens' State Bank of St. Paul v. New Amsterdam Cas. Co.*,
224 N.W. 451 (Minn. 1929) ...................................................................27

*Com. Bank of Bluefield v. St. Paul Fire & Marine Ins. Co.*,
336 S.E.2d 552 (W. Va. 1985) ................................................................24

*Cont'l Bank, N.A. v. Aetna Cas. & Sur. Co.*,
626 N.Y.S.2d 385 (N.Y. Sup. Ct. 1995)...................................... *passim*

*Cooper Sportswear Mfg. Co. v. Hartford Cas. Ins. Co.*,
818 F. Supp. 721 (D.N.J.), *aff'd*, 16 F.3d 403 (3d Cir. 1993) .............................49

*Cummins, Inc. v. Atl. Mut. Ins. Co.*,
56 A.D.3d 288 (N.Y. 2008)....................................................................22

*Dean v. Tower Ins. Co. of New York*,
979 N.E.2d 1143 (N.Y. 2012) ................................................................21

*Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*,
595 N.Y.S.2d 999 (N.Y. Sup. Ct. 1993)............................................2, 22-23, 25, 48

*Employers' Liability Assur. Corp. v. Citizens' Nat. Bank of Peru*,
151 N.E. 396 (Ind. App. 1926) .......................................................................27

*Engel v. CBS, Inc.*,
182 F.3d 124 (2d Cir. 1999).............................................................................19

*Ernst & Young LLP v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
304 A.D.2d 410 (N.Y. App. Div. 2003) ........................................................ 23, 25

*F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
205 F.3d 66 (2d Cir. 2000)............................................................................ 36, 37

*Farmers and Merchants State Bank of Pierz v.*
*St. Paul Fire & Marine Ins. Co.*,
242 N.W.2d 840 (Minn. 1976) .......................................................................27

*FDIC v. Ins. Co. of N. Am.*,
105 F.3d 778 (1st Cir. 1997) ..........................................................................22

*Fed. Ins. Co. v. Axos Clearing LLC*,
982 F.3d 536 (8th Cir. 2020)..........................................................................24

*Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*,
945 N.E.2d 1013 (N.Y. 2011) ....................................................................... 4, 20

*Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*,
346 F.3d 259 (1st Cir. 2003) ..........................................................................24

*First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*,
688 F.3d 265 (6th Cir. 2012).......................................................................... 39, 40

*First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*,
485 F.3d 971 (7th Cir. 2007)..........................................................................22

*French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A.*,
752 F. Supp. 83 (S.D.N.Y. 1990) ................................................................. 21, 22, 45

*Glusband v. Fittin Cunningham & Lauzon, Inc.*,
892 F.2d 208 (2d Cir. 1989)...........................................................................35

*Guarantee Co. of N. Am. v. Mechanics' Sav. Bank & Tr. Co.*,
183 U.S. 402 (1902) .....................................................................................52

iv

*Hudson Ins. Co. v. Oppenheim*,
   81 A.D.3d 427 (N.Y. App. Div. 2011) ................................................51

*In re Baker & Getty Fin. Servs., Inc.*,
   93 B.R. 559 (Bankr. N.D. Ohio 1988)................................... 32-33, 34

*In re Viking Pump, Inc.*,
   52 N.E.3d 1144 (N.Y. 2016) ................................................ 45, 46, 47

*Ins. Co. of N. Am. v. Gibralco, Inc.*,
   847 F.2d 530 (9th Cir. 1988)...................................................... 32, 33

*Janney Montgomery Scott LLC v. Nat. Union*
   *Fire Ins. Co. of Pittsburgh, PA*,
   No. 00130, 2019 WL 400533 (Pa. Com. Pl. Jan. 22, 2019)......................... 33, 44

*Loeb Properties, Inc. v. Fed. Ins. Co.*,
   663 F. Supp. 2d 640 (W.D. Tenn. 2009) ................................................40

*Lynch Properties, Inc. v. Potomac Ins. Co. of Illinois*,
   140 F.3d 622 (5th Cir. 1998)...................................................... 39, 40

*Massachusetts Mut. Life Ins. Co. v. Certain Underwriters*
   *at Lloyd's of London*,
   No. CIV.A. 4791-VCL, 2010 WL 2929552
   (Del. Ch. July 23, 2010) ................................................ 23, 24, 40, 43

*Michalski v. Home Depot, Inc.*,
   225 F.3d 113 (2d Cir. 2000)................................................................31

*Nat'l Bank of Pakistan v. Basham*,
   142 A.D.2d 532 (N.Y. App. Div. 1988) ................................................37

*Nat'l Credit Union Admin. Bd. v. Cumis Ins. Soc'y Inc.*,
   689 F. App'x 428 (6th Cir. 2017)............................................. 48, 49

*New Hampshire Ins. Co. v. MF Glob. Fin. USA Inc.*,
   204 A.D.3d 141 (N.Y. App. Div. 2022) .................................. 5, 30, 31

*New Hampshire Ins. Co. v. MF Global, Inc.*,
   108 A.D.3d 463 (N.Y. App. Div. 2013) ................................... 31, 32, 33

*Ogilvie Sec. Advisors Corp. v. Fed. Ins. Co.*,
   No. 11 C 8554, 2013 WL 12625220 (N.D. Ill. Nov. 18, 2013)............................41

*Raymond James Fin., Inc. v. Fed. Ins. Co.*,
   No. 20-21707-CIV, 2022 WL 4767779 (S.D. Fla. July 22, 2022) ......................46

v

*RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
  21 F.4th 294 (5th Cir. 2021) ........................................................... 3, 39, 40

*Redington v. Hartford Acc. & Indem. Co.*,
  463 F. Supp. 83 (S.D.N.Y. 1978) ........................................................... 53

*Schering Corp. v. Home Ins. Co.*,
  712 F.2d 4 (2d Cir. 1983) ........................................................... 21

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019) ........................................................... 37

*Shearson/Am. Exp., Inc. v. First Continental Bank*,
  579 F. Supp. 1311 ........................................................... 21, 22

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
  985 F.2d 102 (2d Cir. 1993) ........................................................... 30

*Starr Ins. Holdings, Inc. v. U.S. Specialty Ins. Co.*,
  185 A.D.3d 488 (N.Y. App. 2020) ........................................................... 48

*Thomas v. Standard Accident Ins. Co. of Detroit, Mich.*,
  7 F. Supp. 205 (E.D. Mich. 1934) ........................................................... 27

*Three Garden Vill. Ltd. P'ship v. U.S. Fid. & Guar. Co.*,
  567 A.2d 85 (Md. 1989) ........................................................... 24

*Tri City Nat'l Bank v. Fed. Ins. Co.*,
  2004 WI App 12, 674 N.W.2d 617 (Wis. Ct. App. 2003) ........................................................... 22

*United Association Union Loc. No. 290 v. Fed. Ins. Co.*,
  No. CIV. 07-1521-HA, 2008 WL 3523271 (D. Or. Aug. 11, 2008) ........................................................... 48-49

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*,
  748 F.2d 118 (2d Cir. 1984) ........................................................... 51, 52, 53

*Verneco, Inc. v. Fid. & Cas. Co. of N.Y.*,
  219 So.2d 508 (La. 1969) ........................................................... 49

*Vons Cos., Inc. v. Fed. Ins. Co.*,
  212 F.3d 489 (9th Cir. 2000) ........................................................... 24

*West v. AT&T*,
  311 U.S. 223 (1940) ........................................................... 31

*Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*,
  74 A.D.3d 551, 2010 N.Y. Slip Op. 05258 (N.Y. App. Div. 2010) ........................................................... 22

**Statutes & Other Authorities:**

10 New Appleman on Insurance Law Library Edition § 111.01 ............................ 27

10 New Appleman on Insurance Law Library Edition § 111.01(3) ........................ 28

10 New Appleman on Insurance Law Library Edition § 111.01(7)(f) .......... 5, 27, 28

11A Couch on Ins. 3d § 160:8 (2025 ed.) ........................................................ 5, 25

11A Couch on Ins. 3d § 160:57 (2025 ed.) ............................................................ 26

11A Couch on Ins. 3d § 161:58 ................................................................... 26, 27

FINRA Rule 4360 .............................................................................................. 4, 28

Hugh Berkson & David P. Meyer, *Finra Arbitration's Persistent Unpaid
    Award Problem: Piaba's Third Report Concerning Finra's Refusal
    to Tackle the Unpaid Arbitration Award Problem Head-on*,
    29 PIABA B.J. 1 (2022) .......................................................... 29-30

Mark S. Gammell, *Third-Party Claims and Losses Under
    the Financial Institution Bond*, I Fid. L. J. 75 (1995) ............................ 23, 35

Norbert Wegerzyn & John Morrissey, *Fidelity Insurance Policies:
    Yesterday, Today, and Tomorrow*, in Handling Fidelity
    Bond Claims (Michael Keeley & Timothy M. Sukel, eds. 1999) ................. 49

Rule 30(b)(6) of the Federal Rules of Civil Procedure ................................... 13, 19

Rule 56(c)(2) of the Federal Rules of Civil Procedure ........................................... 38

Rule 802 of the Federal Rules of Evidence ........................................................... 38

Rule 1002 of the Federal Rules of Evidence ......................................................... 38

Restatement (First) of Security § 124(1) (1941) ................................................... 49

SEC Order, 76 Fed. Reg. 11542 ..................................................................... 28, 29

SEC Release No. 34-90527, 85 Fed. Reg. 78540 (2020) ............................... 29, 30

Scott L. Schmookler, *The Compensability of Third-Party Losses
    Under Fidelity Bonds*, VII Fid. L. J. 115, 118-129 (2001) ............... 23, 24, 35

William E. Heinbokel, Ananya Barman, Robert Olausen,
    *Fidelity and Crime Insurance Through the Ages*,
    in The Financial Institution Bond and Commercial Crime
    Policy 577 (Michael Keeley, Toni Scott Reed, Robert M.
    Flowers, Megan M. Manogue, J. Caralisa Connell, eds. 2023) ........23, 24, 49

## PRELIMINARY STATEMENT

Cadaret, Grant & Co., Inc. ("Cadaret") was a securities broker-dealer. Beginning nearly ten years ago, several customers initiated arbitration proceedings against Cadaret with the Financial Industry Regulatory Authority ("FINRA"). The customers generally told the same story: one of Cadaret's registered representatives, Steven Pagartanis, convinced them to draft checks on their own outside accounts to directly invest in certain companies without Cadaret's involvement. The investments turned out to be a sham.

Although Cadaret had no control over the outside accounts on which the checks were drawn—and despite Cadaret's lack of knowledge or involvement in the "investments"—the customers sought to recover their losses from Cadaret. Their common theory of liability was that Cadaret was negligent in supervising Pagartanis. Over the next few years, Cadaret made settlement payments to resolve each claim.

Cadaret seeks reimbursement for the settlement payments under a financial institution bond, also known as a "fidelity bond," issued by Great American Insurance Company ("Great American"). The problem is that fidelity bonds are not liability insurance. Instead, fidelity bonds provide indemnity for certain types of first-party losses sustained directly by the insured itself. For that reason, the District Court correctly held the fidelity bond under which Cadaret sued does not cover Cadaret's settlement payments.

The New York Court of Appeals resolved the issue at the heart of this case more than 40 years ago. It held in *175 E. 74th Corp. v. Hartford Acc. & Indem. Co.*, 416 N.E.2d 584 (N.Y. 1980), that fidelity bonds do not insure against liability for an employee's misconduct. *Id.* at 587-88. An employee's theft of a third party's property is covered *only if* the property is "misappropriated from the insured[,]" *i.e.*, while the property is in the care or custody of the insured. *Id.* The rule that fidelity bonds do not cover liability has now gained near universal acceptance nationwide.

The specific bond at issue is crystal clear in precluding coverage for any damages for which Cadaret may be vicariously liable when an employee steals property that belongs to a third party and was not in Cadaret's care or custody at the time of the theft. In fact, the bond has five separate provisions preventing coverage from applying in such circumstances.

First, coverage applies only to loss "resulting directly from" employee dishonesty. (J.A. 434.) Courts applying New York law have held that direct-loss language precludes coverage for third-party losses. *Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co. Inc.*, 246 A.D.2d 202, 213 (N.Y. App. Div. 1998) ("*Kidder Peabody*"); *Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*, 595 N.Y.S.2d 999, 1007-10 (N.Y. Sup. Ct. 1993) ("*Drexel Burnham*"); *Cont'l Bank, N.A. v. Aetna Cas. & Sur. Co.*, 626 N.Y.S.2d 385, 387 (N.Y. Sup. Ct. 1995) ("*Cont'l Bank*").

2

Second, the insuring agreement covers a loss *only if* the employee acted with the "manifest intent … to cause the Insured to sustain such loss[.]" (J.A. 434.) Dishonest acts that target third parties and not the insured do not satisfy the "manifest intent" requirement. *Kidder Peabody*, 246 A.D.2d at 213; *Cont'l Bank*, 626 N.Y.S.2d at 387. Of course, the last thing a dishonest employee who targets a third party would want is for the fraud scheme to be uncovered and the third party to assert that the employer is liable for the third party's loss. *Cont'l Bank*, 626 N.Y.S.2d at 387.

Third, coverage is limited to property that is "(a) owned by the Insured, (b) held by the Insured in any capacity, or (c) owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss." (J.A. 449.) The bond, therefore, does not cover funds over which Cadaret had no control and for which it had no responsibility at the time of the loss. *RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 F.4th 294, 297-300 (5th Cir. 2021).

Fourth, the bond excludes damages for which Cadaret is legally liable to third parties. (J.A. 444.) Section 2(t) expressly states the bond does not cover "damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." (*Id.*)

3

Fifth, the bond has an exclusion for losses resulting from transactions in a customer's account except for direct embezzlement by an employee. (J.A. 443.) Section 2(i) states the bond does not cover "loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful withdrawal and conversion of Money … directly from a customer's account by an employee[.]" (*Id.*)

The lead argument in Cadaret's brief does not focus on the language of the relevant bond provisions or the case law interpreting them. Instead, Cadaret essentially asks the Court to rewrite the bond and transform it into liability insurance because FINRA supposedly required Cadaret to obtain the bond "precisely to protect against such losses." (Appellant's Br. at 2.) Citing FINRA Rule 4360, Cadaret suggests the purpose of a fidelity bond is to cover the insured's vicarious liability to customers for acts committed by the insured's employees. (*Id.* at 20-21.)

The Court "cannot rewrite the agreement[.]" *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 945 N.E.2d 1013, 1017 (N.Y. 2011) (citation omitted). Even if it could, however, Cadaret's contention that FINRA required it to obtain a bond insuring against liability is dead wrong. If anything, the relevant FINRA publications prove the opposite. FINRA Rule 4360 was adopted in 2011 and requires members to obtain bonds based on a specific form. As demonstrated below, that form was revised in 1980 for the specific purpose of confirming it does not cover liability.

4

Cadaret also cherry-picks statements from two treatises to suggest fidelity bonds provide liability insurance. (Appellant's Br. at 21-22.) The treatises it cites, however, actually bolster Great American's position by explaining that a fidelity bond "is not a contract or policy insuring against liability." 11A Couch on Ins. 3d § 160:8 (2025 ed.) (citing *175 E. 74th Corp.* 416 N.E.2d); 10 New Appleman on Insurance Law Library Edition § 111.01[7][f] ("the bond as a rule does not provide coverage for the insured's liability to third parties").

Cadaret also relies heavily on an easily distinguishable case, *New Hampshire Ins. Co. v. MF Glob. Fin. USA Inc.*, 204 A.D.3d 141 (N.Y. App. Div. 2022) ("*MF Global II*"). (Appellant's Br. at 26.) Cadaret suggests *MF Global II* held that fidelity bonds provide coverage whenever an employee of the insured commits a dishonest act that proximately causes a loss to a third party for which Cadaret may be liable. (*Id.* at 22-25.) On the contrary, *MF Global II* acknowledged that fidelity bonds do not cover third-party losses. 204 A.d.3d at 148-51. Based on facts unique to that case, however, it found that the insured itself sustained a direct loss because it experienced "a near instantaneous shortfall" independent of any liability it had to third parties. *Id.* By contrast, Cadaret had no instantaneous shortfall and therefore no direct loss.

Setting aside the issue of whether the bond covers the settlement payments (it does not), the entry of summary judgment for Great American is supported by

5

alternative grounds. Cadaret cannot recover under the bond for several additional reasons based on the timing of Cadaret's discovery of Pagartanis's scheme.

The bond was in effect for the period was November 1, 2017, to November 1, 2018. (J.A. 433.) It indisputable, however, that Cadaret knew about Pagartanis' scheme many months before the bond incepted. Jennifer Abramovich filed a statement of claim against Cadaret on February 1, 2017. (J.A. 927-950.) Abramovich's statement of claim describes the exact same *modus operandi* Pagartanis used to steal from other customers. (J.A. 933-942.) When Cadaret responded on May 10, 2017, it stated that Pagartanis used "deceitful and surreptitious means" and "blatantly lied to Cadaret about his activities in an effort to conceal his involvement with" sham companies. (J.A. 960-961.)

Cadaret's discovery of the scheme in the Spring of 2017 bars its claim for at least four reasons. First, the bond automatically terminates coverage for loss caused by an employee as soon as Cadaret "learns of any dishonest or fraudulent act" by that employee. (J.A. 463.) If the insured knew of a dishonest act before the bond incepted, coverage terminates "immediately upon inception of the bond" such that all losses caused by the employee are excluded regardless of when they occurred. *Cap. Bank & Tr. Co. v. Gulf Ins. Co.*, 91 A.D.3d 1251, 1253-1254 (N.Y. App. Div. 2012). As a result, the bond at issue never covered Pagartanis in the first place.

6

Second, coverage applies only to loss "discovered" during the bond period. (J.A. 445.) Discovery occurs when Cadaret "first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred … even though the exact amount or details of the loss may not then be known." (*Id.*) Since Cadaret knew about the scheme by May of 2017, it discovered the loss before the bond period.

Third, Cadaret failed to comply with conditions in the bond that required it to provide notice within thirty days of discovery and submit a sworn proof of loss within six months of discovery. (J.A. 446.) Cadaret did not even provide notice, let alone a proof of loss, until almost a year after discovering the loss.

Fourth, Cadaret's complaint is time-barred. The bond has a contractual limitations period requiring Cadaret to initiate legal proceedings within two years of discovering a loss. (J.A. 446.) Cadaret missed that deadline.

## STATEMENT OF THE ISSUES

1.    Whether the District Court was correct in holding the settlement payments are not loss resulting directly from employee dishonesty, and, therefore, are not covered?

2.    Whether the District Court was correct in holding the funds Pagartanis stole from third parties do not qualify as covered property?

7

3. Whether the District Court was correct in holding Exclusion 2(t) precludes Cadaret from recovering settlement payments it made to avoid being held liable for damages?

4. Alternatively, whether Cadaret failed to establish coverage because there is no evidence Pagartanis acted with the manifest intent to cause Cadaret to sustain loss?

5. Alternatively, whether Exclusion 2(i), which excludes loss resulting from transactions in a customer's account except direct embezzlement, precludes Cadaret from recovering?

6. Alternatively, whether coverage for Pagartanis terminated immediately upon inception of the bond due to Cadaret's prior knowledge of his dishonest acts?

7. Alternatively, whether Cadaret's claim is not covered under the bond because Cadaret discovered the loss before the bond period?

8. Alternatively, whether Cadaret is precluded from recovering because it failed to comply with the bond's timely notice and proof of loss requirements?

9. Alternatively, whether the complaint is time-barred because Cadaret did not sue until after the contractual period of limitations expired?

8

## STATEMENT OF THE CASE

### I.     The Financial Institution Bond

Great American issued a fidelity bond to Cadaret with a bond period of November 1, 2017, to November 1, 2018. (J.A. 443.) The bond covers loss resulting directly from certain named perils provided Cadaret "discovered" the loss during the bond period. (J.A. 445.) Section 3 defines "discovered" as follows:

> … Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known. …

(*Id.*)

Insuring Agreement (A) states:

> **Fidelity**
>
> **(A)**   Loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
>
> > **(1)**   to cause the Insured to sustain such loss; and
> >
> > **(2)**   to obtain an improper financial benefit for the Employee or another person entity. …

(J.A. 434.)

Section 11 of the bond states:

9

> This bond shall apply to loss of Property **(a)** owned by the Insured, **(b)** held by the Insured in any capacity, or **(c)** owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss. This bond shall be for the sole use and benefit of the Insured named in the Declarations.

(J.A. 449.)

Section 2(t) excludes:

> damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages[.]

(J.A. 444.)

Section 2(i) excludes:

> loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful withdrawal and conversion of Money, securities or precious metals, directly from a customer's account by an employee provided such unlawful withdrawal and conversion is covered under Insuring Agreement **(A)**.

(J.A. 443.)

The Termination or Cancellation Condition, as amended by Rider No. SR 6332, states:

> This bond terminates as to any Employee, (a) as soon as any Insured, or any director or officer of an Insured who is not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured

10

or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or (b) 15 days after the receipt by the Insured of a Written notice from the Underwriter of its desire to cancel this bond as to such person. …

(J.A. 463.) Exclusion 2(cc), as amended by Rider No. SR 6332, contains a similar provision. (*Id*.)

Section 5 states:

> **(a)** At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.
>
> **(b)** Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.
> …
> **(d)** Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss. …

(J.A. 446.)

## II. Cadaret's Pre-Bond Discovery of Pagartanis's Scheme

On February 1, 2017, Jennifer Abramovich filed a statement of claim against Cadaret. (J.A. 927-950.) She alleged Pagartanis told her to draft a check payable to "SONESTA HOLDINGS" in the amount of $200,000 by representing that Sonesta Holdings, Inc. ("Sonesta") was a boutique hotel chain and that "an investment in SONESTA would return a 'guaranteed minimal 8%.'" (J.A. 933-934.) Pagartanis

11

persuaded her to make additional investments in Sonesta and another company, Kinnico Land Trust ("Kinnico"), by transferring funds from her legitimate brokerage accounts to her personal checking accounts and then drafting checks payable to those entities. (J.A. 932-937.) Abramovich described Pagartanis's "scheme" as follows:

> PAGARTANIS would, from time to time, call JENNIFER and tell her he was selling off some "stock" so additional purchases of REITS could be made. He explained that the proceeds from the sale of her "stock" would be wired into her checking account, after which he would summon her to his office to write a check or checks payable to "SONESTA HOLDINGS" or to "KINNICO LAND TRUST."

(J.A. 936-937.)

Abramovich claimed Pagartanis initially "refused" to send her any statements or "written evidence or documentation of the[] existence" of Sonesta or Kinnico, and the "'statement'" he did eventually send "was a document which had the appearance of being generated on his own computer and contained none of the investment sponsors' values or anything that resembled third party or objective market valuations." (J.A. 939-940.) Pagartanis eventually deposited funds into Abramovich's account, but she claimed he did not provide any documentation or accounting, such that, "to this date, [Abramovich] has no idea, understanding, or knowledge concerning how the SONESTA or KINNICO investments 'performed,' if at all, what profits or losses are attributable to which of the investments, whether her funds actually were invested at all, whether her money was used to fund

12

something nefarious; or whether they were used in PAGARTANIS', or other third parties' bank account." (J.A. 940-941.)

Cadaret filed an answer in response to the statement of claim on May 10, 2017. (J.A. 952-972.) It says Pagartanis "blatantly lied" to Cadaret to conceal his scheme:

> [S]uch investments were intentionally concealed from Cadaret by Pagartanis.
>
> …
>
> On the contrary, Mr. Pagartanis knew that such investments would never be approved by Cadaret, so he intentionally evaded Cadaret's detection of his involvement in these investments through deceitful and surreptitious means.
>
> …
>
> Mr. Pagartanis blatantly lied to Cadaret about his activities in an effort to conceal his involvement with Kinnico and Sonesta.

(J.A. 952-953, 960-961.)

Samuel E. Cohen, Esq. of Marshall Dennehey, P.C. represented Cadaret in connection with the Abramovich claim. (J.A. 737:17-738:1.) Cadaret adopted Cohen's testimony as its own for purposes of Rule 30(b)(6) of the Federal Rules of Civil Procedure. (J.A. 738:2-739:20.)

Cohen testified that Cadaret's allegations about Pagartanis lying were true when he filed the answer on May 10, 2017:

> Q. … [T]he last sentence reads: Mr. Pagartanis blatantly lied to Cadaret about his activities in an effort to conceal his involvement with Kinico and Sonesta. Was that statement true at the time that you filed this Answer?
> A. Yes.

> Q. And can you tell me specifically what Mr. Pagartanis lied about to Cadaret?
>
> A. Mr. Pagartanis didn't disclose these entities as outside business activities as he was required to do.

(J.A. 1084:3-16; *see also* J.A. 1081:6-19.)

When Cadaret received Abramovich's statement of claim, Cadaret's file on Pagartanis contained a report dated August 25, 2015, that identified Sonesta as being associated with Pagartanis. (J.A. 701-702, 732:8-14, 734:5-735:8.) Public records available online through the New York Department of State listed Pagartanis as the Chief Executive Officer and the Principal of Sonesta. (J.A. 772-777.) Thus, Cadaret could have confirmed that Pagartanis owned Sonesta by simply reviewing records that were in its own file and publicly available.

## III. The Bond Claim

On April 18, 2018, Cadaret notified Great American that Sieglinde Rothschild had filed a statement of claim alleging "Pagartanis made unauthorized investments of her assets into an account he controlled and that she lost the entirety of the investment as a result." (J.A. 779.) On April 23, 2018, Great American responded to Cadaret's initial notice by requesting a proof of loss, explaining the bond was not a liability policy, and declining to defend Cadaret. (J.A. 781-782.)

Between April 1, 2019, and July 8, 2020, Cadaret submitted four proofs of loss seeking to recover settlement payments it made to numerous third parties who claimed to be victims of Pagartanis' Ponzi scheme. (J.A. 1057-1075.) Cadaret also

14

claims it made additional settlement payments that were not included in the proofs of loss. (J.A. 24 at ¶ 56; Appellant's Br. at 14.) Cadaret seeks to recover a total of $3,256,0000 in connection with the settlement payments. (Appellant's Br. at 14-15.)

The proofs of loss describe the scheme as follows:

> Mr. Pagartanis effectuated his scheme, in most instances, by convincing the claimant-investors to take the following steps: (i) to liquidate portions of their Cadaret brokerage accounts; (ii) to then write [*sic*] funds from their Cadaret accounts to their personal bank accounts; (iii) and then to write checks to "Genesis" from their personal bank accounts, which Mr. Pagartanis deposited into a bank account he controlled.

(J.A. 1057-1075.) Cadaret's complaint describes the scheme in a similar manner. (J.A. 20-21 at ¶ 31.)

Great American issued an interrogatory asking Cadaret to "[s]tate whether you contend that Pagartanis withdrew and converted money directly from a customer's account," and, if so, to provide certain information identifying such transactions. (J.A. 785-786.) Cadaret's answer does not state that Cadaret claims Pagartanis withdrew and converted money directly from a customer's account, and it does not identify any specific transactions. (*Id*.) With respect to Pagartanis's methods, Cadaret stated only that "Pagartanis convinced clients to liquidate portions of funds held by clients in Cadaret brokerage accounts and to wire funds from their Cadaret accounts to their personal bank accounts and to write checks to 'Genesis' from their personal bank accounts." (*Id*.)

15

Cadaret's corporate representative, Donald Taylor, testified that Cadaret is not aware of any instances in which Pagartanis himself withdrew money from a customer's account:

> Q. Are you aware of any instances in which Mr. Pagartanis himself withdrew money from Cadaret brokerage accounts without authorization from the client?
> A. I'm not aware of that.
> Q. Did—are you aware of any claimants making allegations of that nature?
> A. No.

(J.A. 730:4-10.) Cohen, whose testimony Cadaret adopted as its own, also admitted he is not aware of any instances in which Pagartanis withdrew money from a customer's account. (J.A. 1092:19-24, 1096:15-1097:7, 1101:23-1102:23.)

None of the checks the customers made payable to Genesis were drafted on accounts held by Cadaret. (J.A. 731:6-13.) Moreover, neither Pagartanis nor Cadaret had any access to, control over, or responsibility for the bank accounts. (J.A. 731:6-13, 1094:12-25, 1097:3-7, 1099:10-1100:13.) None of the customers alleged Pagartanis had access to their personal bank accounts, drafted the checks, or personally facilitated the transfer of funds to Genesis. (J.A. 1099:17-100:13.) Instead, the customers alleged Pagartanis induced them to write checks themselves that were payable to Genesis. (J.A. 1099:25-1100:13.)

Pagartanis did not send the customers statements or other documents suggesting their investments in Genesis were transacted through Cadaret. (J.A. 992-

993, 998-1001, 1014-1016, 1021-1023, 1036-1038, 1042-1045.) Nor did he make any representations to the effect. (*Id.*) Accordingly, the customers were on notice that their investments were not transacted through Cadaret. (*Id.*) As Cadaret itself repeatedly explained in the FINRA proceedings: "It could not have been more clear to Claimant that Cadaret had nothing to do with her purported investment in Genesis." (J.A. 1001, 1023, 1045.)

## SUMMARY OF THE ARGUMENT

This Court should affirm the entry of summary judgment because the District Court was correct in holding that the fidelity bond under which Cadaret sued does not cover settlement payments Cadaret made to resolve claims asserted by third parties. The fact that fidelity bonds do not provide liability insurance has been settled law in New York for more than 40 years. *175 E. 74th Corp.*, 416 N.E.2d at 587.

The specific bond at issue has five separate provisions that bar coverage for Cadaret's claim regardless of whether the focus is on the transactions that caused third parties to sustain losses or on the settlements Cadaret paid years later to avoid being held liable for those third-party losses. As the District Court correctly held, the settlement payments did not result "directly" from Pagartanis's scheme, the funds Pagartanis took from third parties were not covered property, and Exclusion 2(t) bars recovery of damages for which Cadaret is legally liable. Furthermore, Cadaret failed to prove Pagartanis acted with the manifest to cause Cadaret (as opposed to the

17

customers) to sustain loss, and Exclusion 2(i) bars loss resulting from transactions in a customer's account besides direct embezzlement.

Alternatively, this Court should affirm the entry of summary judgment for several reasons related to the timing of Cadaret's discovery of Pagartanis's dishonest acts. First, the bond never covered Pagartanis because Cadaret knew before the bond incepted that he had committed dishonest acts. Second, Cadaret discovered the loss before the bond period. Third, Cadaret breached conditions in the bond requiring it to provide notice and a proof of loss within specified periods of time. Fourth, Cadaret's claim is time-barred because Cadaret did not file a lawsuit until after the contractual period of limitations expired.

## ARGUMENT

**I.** **THE DISTRICT COURT WAS CORRECT IN HOLDING THAT THE BOND DOES NOT COVER THE SETTLEMENT PAYMENTS.**

### A. Binding Precedent Forecloses Cadaret's Claims.

The parties agree the substantive law of New York applies. (Appellant's Br. at 19.) It is settled law in New York that fidelity bonds do not insure against liability. *175 E. 74th Corp.*, 416 N.E.2d at 587. The New York Court of Appeals held:

> The policy insures only against loss to the insured sustained through the dishonesty of its employees. It does not contemplate and is not dependent upon the assertion of a third-party claim. … And the loss occurs when money or other covered property is misappropriated from the insured, irrespective of the capacity in which the insured holds it. That the insured may be liable to a third party for a loss of money resulting from employee

18

> dishonesty does not transform a policy covering the insured against a direct loss into one indemnifying against liability[.]

*Id*. (citations omitted).

This Court is "bound to apply New York law as determined by the New York Court of Appeals." *Engel v. CBS, Inc.*, 182 F.3d 124, 125 (2d Cir. 1999) (citation omitted). The holding by the New York Court of Appeals that fidelity bonds do not insure against liability is therefore binding.

Cadaret acknowledges *175 E. 74th Corp.* but brushes it off as "inapplicable." (Appellant's Br. at 31.) The only explanation Cadaret provides is as follows: "Cadaret, the bondholder, suffered a 'direct loss' of client funds misappropriated by its then registered representative, which the New York Court of Appeals in *175 E. 74th Corp.* acknowledges is covered by the bond." (*Id.*)

Cadaret's attempt to distinguish *175 E. 74th Corp.* cannot be reconciled with Cadaret's own complaint, interrogatory answers, sworn proofs of loss, deposition testimony, or the facts stated in its own opening brief in this appeal. Time after time, Cadaret has consistently admitted that Pagartanis took the customers' money by negotiating checks that were drawn on the customers' outside accounts to which Cadaret had no access, over which it had no control, and for which it had no responsibility. (J.A. 20-21 (¶ 31), 731:6-13, 785-786, 1057-1075, 1094:12-25, 1097:3-7, 1099:10-1100:13) Cadaret's own Rule 30(b)(6) representative and the attorney who represented Cadaret in the underlying FINRA proceedings both

19

admitted that Pagartanis did not take any money from an account held by Cadaret. (J.A. 730:4-10, 1092:19-24, 1096:15-1097:7, 1101:23-1102:23.)

*175 E. 74th Corp.* clearly states a "loss occurs when money or other covered property is misappropriated from the insured, irrespective of the capacity in which the insured holds it." 416 N.E.2d at 587. Since Cadaret did not hold the funds in any capacity at the time of the misappropriation, *i.e.*, when Pagartanis negotiated checks drawn on the customers' outside accounts, the funds were not "misappropriated from the insured[,]" as required to trigger coverage under binding precedent. *Id.*

### B. Unambiguous Bond Provisions Preclude Coverage from Attaching to Cadaret's Liability to Third Parties.

The specific terms of the bond at issue make it clear as day that the bond does not cover Cadaret's vicarious liability for the loss of a third party's property over which Cadaret had no control and for which it had no responsibility at the time of the loss. As explained below, at least five separate bond provisions bar Cadaret from recovering its claimed loss.

To interpret insurance products, like all contracts, "[courts] first look to the language of the applicable policies." *Fieldston Prop. Owners Ass'n, Inc.*, 945 N.E.2d at 1017 (citation omitted). "If the plain language of the policy is determinative, [a court] cannot rewrite the agreement by disregarding that language[.]" *Id.* (citation omitted). The Court "may not judicially rewrite the language of [a] polic[y]" in order to reach what it may view as "a more equitable result." *Id.* (citation omitted).

20

Since the bond is not ambiguous, it must be enforced as written. *Id.* It is worth nothing, however, that Cadaret's brief is incorrect to the extent it claims ambiguities in fidelity bonds "are construed against the insurance company and in favor of coverage." (Appellant's Br. at 20 (citing *Dean v. Tower Ins. Co. of New York*, 979 N.E.2d 1143 (N.Y. 2012).) The case Cadaret relies on involved a homeowner's insurance policy. *Id.* The general rule that case recites, however, does not apply to fidelity bonds. *French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 752 F. Supp. 83, 89 n.6 (S.D.N.Y. 1990).

The rule Cadaret cites, which is known as "*contra proferentem*," is founded on an "adhesion contract rationale" recognizing that individual policyholders generally do not have bargaining power and are not involved in drafting insurance policies marketed to unsophisticated consumers. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983) (citations omitted). That rationale does not apply to fidelity bonds sold to financial institutions, such as Cadaret, for two reasons.

First, standard terms in financial institution bonds are derived from a form that was "the result of the combined efforts of the Surety Association of America and the American Bankers Association." *Shearson/Am. Exp., Inc.*, 579 F. Supp. at 1311. "The latter reviewed drafts, recommended changes, and consulted with the drafters" and, therefore, "[t]he crucial fact of unequal bargaining power is not present." *Id.* (citations omitted). For that reason, numerous courts, including at least one in New

21

York, have held that *contra proferentem* does not apply to financial institution bonds. *Id.*; *French Am. Banking Corp.*, 752 F. Supp. at 89 n.6.; *Citibank Tex., N.A. v. Progressive Cas. Ins. Co.*, 522 F.3d 591, 595 n.12 (5th Cir. 2008); *First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 976-977 (7th Cir. 2007); *FDIC v. Ins. Co. of N. Am.*, 105 F.3d 778, 786-87 (1st Cir. 1997); *Tri City Nat'l Bank v. Fed. Ins. Co.*, 2004 WI App 12, ¶¶ 10-11, 674 N.W.2d 617, 621 (Wis. Ct. App. 2003); *Citizens Bank, N.A. v. Kan. Bankers Sur. Co.*, No. 95,136, 2007 Kan. App. Unpub. LEXIS 524, at *9 (Kan. Ct. App. Jan. 5, 2007).

Second, the rule of *contra proferentem* does not apply to a "sophisticated policyholder[.]" *Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*, 74 A.D.3d 551, 2010 N.Y. Slip Op. 05258, at *1 (N.Y. App. Div. 2010) (citing *Cummins, Inc. v. Atl. Mut. Ins. Co.*, 56 A.D.3d 288, 290 (N.Y. 2008)); *Certain Underwriters at Lloyd's, London v. Essex Glob. Trading, Inc.*, 147 A.D.3d 595, 596 (N.Y. App. Div. 2017). There is no question that Cadaret is a "sophisticated" policyholder.

### 1. Cadaret Did Not Sustain a Direct Loss.

Insuring Agreement (A) applies only to loss "resulting directly from" employee dishonesty. (J.A. 434.) Several courts applying New York law have held that direct-loss language limits coverage to loss sustained directly by the insured itself and prevents coverage from attaching to the insured's liability for a third party's loss. *Kidder Peabody*, 246 A.D.2d at 213; *Drexel Burnham*, 595 N.Y.S.2d at

22

1007-10; *Cont'l Bank*, 626 N.Y.S.2d at 387; *see Ernst & Young LLP v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 304 A.D.2d 410 (N.Y. App. Div. 2003).

The holdings in *Kidder Peabody*, *Drexel Burnham*, *Cont'l Bank,* and *Ernst & Young* are consistent with the historical origin of the direct-loss requirement. The phrase "resulting directly from" was incorporated into standard fidelity bond forms, in part, to resolve a split in authority as to whether third-party losses were covered. *Massachusetts Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, No. CIV.A. 4791-VCL, 2010 WL 2929552, at *15-18 (Del. Ch. July 23, 2010); William E. Heinbokel, Ananya Barman, Robert Olausen, *Fidelity and Crime Insurance Through the Ages*, in THE FINANCIAL INSTITUTION BOND AND COMMERCIAL CRIME POLICY 577, 587-88 (Michael Keeley, Toni Scott Reed, Robert M. Flowers, Megan M. Manogue, J. Caralisa Connell, eds. 2023) (J.A. 805-806); Scott L. Schmookler, *The Compensability of Third-Party Losses Under Fidelity Bonds*, VII Fid. L. J. 115, 118-129 (2001) (J.A. 825-831); Mark S. Gammell, *Third-Party Claims and Losses Under the Financial Institution Bond*, I Fid. L. J. 75 (1995) (J.A. 865-886).

Before 1980, standard fidelity bond forms covered loss "through" employee dishonesty, and a split in authority developed as to whether they covered vicarious liability to third parties. *Id*. In 1980, the Surety Association of America ("SAA") revised its standard form "to curtail the expansive range of third-party claims for which the courts had found coverage[.]" Gammell, *supra*, at 79 (J.A. 869). One key

23

change was the replacement of the "through" causation standard with the more stringent "resulting directly from" standard. *Id*.; Schmookler, *supra*, at 118-129 (J.A. 825-831). The changes "ensure[d] that the bond only covered losses for embezzlement-type acts[.]" Heinbokel, *supra*, at 588 (J.A. 805-806).

The adoption of a direct-loss causation standard "proved pivotal" and effectively resolved the split in authority. *Massachusetts Mut. Life Ins. Co.*, 2010 WL 2929552, at *17. As the Delaware Court of Chancery explained in a thorough and well-researched opinion: "The now prevailing approach starts from the indisputable proposition that fidelity bonds provide indemnification against first-party property loss, not protection against third-party liability." *Id*. That conclusion is supported by numerous published opinions issued by appellate courts throughout the country. *See*, *e.g.*, *Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.*, 346 F.3d 259, 264 (1st Cir. 2003); *Fed. Ins. Co. v. Axos Clearing LLC*, 982 F.3d 536, 542-43 (8th Cir. 2020); *Vons Cos., Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 492-93 (9th Cir. 2000); *Com. Bank of Bluefield v. St. Paul Fire & Marine Ins. Co.*, 336 S.E.2d 552, 559 (W. Va. 1985); *Cent. Nat. Ins. Co., of Omaha v. Ins. Co. of N. Am.*, 522 N.W.2d 39, 42-43 (Iowa 1994); *Three Garden Vill. Ltd. P'ship v. U.S. Fid. & Guar. Co.*, 567 A.2d 85, 93 (Md. 1989). The foregoing citations are just a small sample.

Significantly, New York is not one of the states that interpreted pre-1980 fidelity bond forms to cover liability. The bond at issue in *175 E. 74th Corp.* used

24

the "through" standard, but the New York Court of Appeals still held that it did not cover liability. 416 N.E.2d at 587-88. It stands to reason, therefore, that the New York Court of Appeals would agree with *Kidder Peabody*, *Drexel Burnham*, *Cont'l Bank,* and *Ernst & Young*—as well as the overwhelming majority of cases in other jurisdictions—that the more stringent direct-loss causation standard does not extend coverage to liability for third-party losses.

Despite the well-documented drafting history of the direct-loss requirement, Cadaret argues that the District Court's Opinion "Fundamentally Misunderstands and Improperly Limits the Coverage Provided by a Fidelity Bond." (Appellant's Br. at 20.) The sources Cadaret cites, however, actually provide further confirmation that fidelity bonds do not cover liability.

Couch on Insurance, which Cadaret characterizes as "authoritative" (Appellant's Br. at 22), states: "Where a fidelity bond insures only against loss to the insured sustained through the dishonesty of its employees and neither contemplates nor is dependent upon the assertion of any third-party claim, it is not a contract or policy insuring against liability." 11A Couch on Ins. 3d § 160:8 (2025 ed.) (citing *175 E. 74th Corp.* 416 N.E.2d). It also explains a bond will not cover a customer's loss "where the bond was designed to indemnify the bank, not third persons, against direct losses of money or property through employee dishonesty

25

and where no liability arose until the bank sustained a proven loss." 11A Couch on Ins. 3d § 160:57 (2025 ed.) (citation omitted).

Ignoring the relevant sections, Cadaret quotes a different passage from Couch on Insurance that cites outdated cases interpreting obsolete bond forms for the general proposition that bonds are "'**not necessarily** limited to loss resulting directly resulting from the employee's acts'" and "'**may** include liability[.]'" (Appellant's Br. (quoting 11A Couch on Ins. 3d § 161:58) (emphasis added).) Cadaret's reliance on that passage is misplaced for at least three reasons.

First, on its face, the passage Cadaret quotes applies only to bonds that do not include direct-loss language. The introductory clause states that bonds are "not necessarily limited to loss directly resulting from the employee's acts[.]" *Id.* The discussion that follows, therefore, clearly addresses bonds that *do not* include language limiting coverage to "loss directly resulting from the employee's acts[.]" *Id.* Since the bond at issue in this case explicitly states that it applies to loss "resulting directly from" employee dishonesty (J.A. 434), Couch on Insurance's discussion of bonds that do not include a direct-loss requirement is irrelevant.

Second, the four cases cited in the passage Cadaret quotes also show the passage is not intended to address bonds with direct-loss requirements. All four cases, three of which are nearly 100 years old, predate the adoption of the direct-loss requirement in 1980, and none of them interpret a direct-loss causation standard. *Id.*

(citing *Thomas v. Standard Accident Ins. Co. of Detroit, Mich.*, 7 F. Supp. 205 (E.D. Mich. 1934); *Farmers and Merchants State Bank of Pierz v. St. Paul Fire & Marine Ins. Co.*, 242 N.W.2d 840 (Minn. 1976); *Citizens' State Bank of St. Paul v. New Amsterdam Cas. Co.*, 224 N.W. 451 (Minn. 1929); *Employers' Liability Assur. Corp. v. Citizens' Nat. Bank of Peru*, 151 N.E. 396 (Ind. App. 1926)).

Third, unlike the cases cited in the passage Cadaret quotes, New York rejected the argument that causation standards in prior bond forms covered an insured's liability to third parties. Again, the bond at issue in *175 E. 74th Corp.* used the "through" standard, but the New York Court of Appeals still held that it did not cover vicarious liability. 416 N.E.2d at 587-88. Thus, binding precedent would trump the general statements in 11A Couch on Ins. 3d § 161:58 even if those statements applied to bonds with direct-loss language (which they do not).

Cadaret also cites 10 New Appleman on Insurance Law Library Edition. (Appellant's Br. at 22.) As Cadaret notes, Section 111.01 states that "[t]he bond may provide coverage in certain circumstances for the loss of a third party's funds or property while in the possession of the insured." 10 New Appleman on Insurance Law Library Edition § 111.01[7][f]. Cadaret conveniently omits, however, that the very same paragraph goes on to state:

> [T]he bond as a rule does not provide coverage for the insured's liability to third parties for fraud or other torts committed against third parties by the insured or its employees. Such liability is not

> a loss. Even if it were, it would not be a direct loss to the insured and such legal liability is specifically excluded by the bond.

*Id.*

An earlier passage in the same general section further explains:

> [F]idelity insurance is distinct from more common liability insurance in several key respects. First, it generally does not insure against the risk of legal liability to others resulting from the insured's actions or those of its employees, including even dishonest acts of employees toward third-persons unless those acts result in a direct loss to the insured. …

*Id.* at § 111.01[3] (citation omitted).

Cadaret also mistakenly relies on FINRA Rule 4360, arguing that it required Cadaret to maintain a fidelity bond to cover losses sustained by customers. (Appellant's Br. at 5-6, & 20-21.) If anything, however, the relevant FINRA publications reveal that FINRA *did not* require Cadaret to maintain a bond that would cover liability for third-party losses.

The text of FINRA Rule 4360 states only that a member must maintain a bond with "Insuring Agreements covering at least … (A) Fidelity[.]" It does not say anything whatsoever about whether the insuring agreement must cover losses sustained by customers. The rule itself, therefore, is silent on the issue.

The Securities and Exchange Commission's Order approving FINRA Rule 4360 ("SEC Order") provides some clarity. SEC Order, 76 Fed. Reg. 11542. The SEC Order explains that members are required to obtain fidelity bonds "in a form

28

substantially similar to the standard form of Brokers Blanket Bond promulgated by the Surety Association of America." *Id.* It even references the specific form number at issue in this case, *i.e.*, Form No. 14. (*Compare id.* at 11544 *with* J.A. 433.)

The SEC Order was issued in 2011 and expresses a clear preference for the bond form issued by the SAA. SEC Order, 76 Fed. Reg. 11542. As explained above, that form was revised in 1980 to confirm the bond does not cover liability for third-party losses. FINRA and the SEC were presumably aware of that history when they required members to use the form in 2011. They knew, therefore, that bonds written on the specific form they required would not cover liability for a customer's loss.

More recent publications also suggest FINRA knows the bond it requires does not provide liability insurance. For example, an SEC release from 2020 explains that one benefit to a proposed rule on restricted deposit requirements was that "firms may be incentivized to obtain insurance coverage for potential arbitration awards[.]" SEC Release No. 34-90527, 85 Fed. Reg. 78540, 78565 (2020). It says: "FINRA believes that if Restricted Firms were able to procure errors and omissions insurance policies or other kinds of insurance coverage for some or all of the kinds of claims that customers typically bring in arbitrations, at meaningful coverage amounts, that could warrant a reduced Restricted Deposit Requirement[.]" *Id.* at 78564.

Other publications show the industry has been debating how to address the fact that a large number of arbitration awards go unpaid. *See*, *e.g.*, Hugh Berkson &

29

David P. Meyer, *Finra Arbitration's Persistent Unpaid Award Problem: Piaba's Third Report Concerning Finra's Refusal to Tackle the Unpaid Arbitration Award Problem Head-on*, 29 PIABA B.J. 1 (2022). One of the proposed solutions is "instituting an insurance requirement[,]" *id.* at 3, since "neither the SEC nor FINRA have established any sort of insurance requirement" *id.* at 20. Some members argued against such a requirement because it would create a "'moral hazard'" and "encourage more violations of securities laws[.]" *Id.*

The fact that FINRA is actively considering ways to encourage members to procure liability insurance policies to cover "the kinds of claims that customers typically bring in arbitrations" without mandating it clearly indicates that FINRA knows such coverage is not provided by the fidelity bonds it already requires. 85 Fed. Reg. at 78565. Otherwise, there would be no need for firms to be "incentivized to obtain insurance coverage for potential arbitration awards[.]" *Id.*

Faced with binding precedent, persuasive opinions by other New York courts, and the near universal consensus of judges and scholars across the country confirming that fidelity bonds do not cover liability, Cadaret relies on a single decision applying New York law, *MF Global II*.[1] (Appellant's Br. at 22-28.) Cadaret repeatedly insists *MF Global II* is "controlling." (*Id.*) It is not. "The holding of 'an

---

[1] Cadaret also cites *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102 (2d Cir. 1993). (Appellant's Br. at 26.) That case is irrelevant, however, because it did not interpret a bond or insurance policy.

intermediate appellate state court ... is a datum for ascertaining state law[,]'" but it is not binding if a federal court is "'convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) (quoting *West v. AT&T*, 311 U.S. 223, 237 (1940)).

More importantly, *MF Global II* does not support Cadaret's position. *MF Global II* reaffirmed an earlier holding in *New Hampshire Ins. Co. v. MF Global, Inc.*, 108 A.D.3d 463 (N.Y. App. Div. 2013) ("*MF Global I*"), that the insured sustained a direct loss. The *MF Global* opinions actually support Great American's position because they reaffirmed *Kidder Peabody*'s holding that fidelity bonds with direct-loss requirements do not cover liability to third parties.

The insured in *MF Global I* was a clearing member of the Chicago Mercantile Exchange that sustained "a near instantaneous shortfall" when an employee made unauthorized trades that the insured was "automatically" responsible to cover by transferring its own funds to the exchange's clearing house. 108 A.D.3d at 465-68. The insurer argued that the loss was indirect because it was based on contractual liability. *Id*. The court held, however, that the loss was direct. *Id*.

Critically, the *MF Global I* court did not hold that fidelity bonds cover third-party losses, and it did not contradict its prior decision in *Kidder Peabody*. *Id*. at 466-67. Instead, the court reaffirmed the validity of, but distinguished, *Kidder Peabody* by finding that the loss at issue in *MF Global* was not, in fact, a third-party

31

loss. *Id*. The opinion expressly found that "the payment to the [clearing house] is not a third-party loss for which MF Global is liable." *Id*. Rather, it was "a near instantaneous shortfall for which MF Global, as a clearing member, was automatically and directly responsible." *Id.* The court agreed that the loss at issue in *Kidder Peabody* was indirect, however, because it arose from settlement payments a broker-dealer made to satisfy liability for third-party losses. *Id*.

Cadaret's loss is not remotely analogous to the loss at issue in *MF Global I*. Like the insured in *Kidder Peabody*, Cadaret did not sustain any loss until it made settlement payments to resolve disputed claims years after the customers had losses. Accordingly, the distinction the First Department drew between *Kidder Peabody* and *MF Global* supports Great American's position.

The District Court addressed the issue directly:

> Here, the causal chain is similarly protracted as the causal chain in *Kidder*—Pagartanis' conduct led to clients withdrawing funds from Plaintiff to their personal checking accounts, transferring those funds to entities Pagartanis controlled, which led to losses to clients, which led to mediation, which concluded in settlements Cadaret paid years after Pagartanis' conduct. Thus, Plaintiff's third-party loss is not a "direct loss" contemplated by or covered under the Bond.

(S.A. 12.) This Court should reach the same conclusion.

Cadaret also cites three cases from other jurisdictions for the proposition that fidelity bonds cover liability to third parties, *Ins. Co. of N. Am. v. Gibralco, Inc.*, 847 F.2d 530 (9th Cir. 1988); *In re Baker & Getty Fin. Servs., Inc.*, 93 B.R. 559 (Bankr.

32

N.D. Ohio 1988); and *Janney Montgomery Scott LLC v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, No. 00130, 2019 WL 400533 (Pa. Com. Pl. Jan. 22, 2019). (Appellant's Br. at 33-34.) To the extent those case found coverage for third-party liability, they cannot be squared with binding precedent, the other New York opinions cited above (including *MF Global I*), the vast majority of opinions from other jurisdictions, and treatises Cadaret characterizes as "authoritative." This Court cannot disregard *175 E. 74th Corp.*, and it should not disregard the overwhelming weight of persuasive authority in favor of three non-binding, outlier cases.

Further, the out-of-jurisdiction cases Cadaret cites are inapposite. *Gibralco, Inc.* interpreted a bond with the outdated "through" causation standard. 847 F.2d at 531 n.3. As previously explained, the SAA replaced that standard with the direct-loss requirement in the bond at issue for the specific purpose of clarifying it does not cover liability. Moreover, *Gibralco* focused on whether a "trading loss exclusion" applied, not on whether the bond covered third-party losses.

*In re Baker & Getty Fin. Servs., Inc.* is distinguishable because the court found that the insured itself sustained a loss "contemporaneously" with any third-party loss due to the fact that the funds at issue were misappropriated from accounts owned by companies affiliated with the insured and checks made out to the insured. 93 B.R. at 564. Since Pagartanis did not misappropriate funds from accounts owned by Cadaret, and he did not steal checks made payable to Cadaret, *In re Baker & Getty*

33

*Fin. Servs., Inc.* simply does not apply to the facts of this case. (J.A. 731:6-13, 1094:12-25, 1097:3-7, 1099:10-1100:13.)

Finally, Cadaret argues that two general references in the bond to the concept of liability suggest it covers liability. (Appellant's Br. 33.) Cadaret conveniently omits a third provision that says the bond does not cover "damages of any type for which the Insured is legally liable[.]" (J.A. 444.) As explained in Section I.B.4. below, that exclusion applies in this case.

Moreover, the general references to liability Cadaret cites do not suggest the bond covers liability for third-party losses. Those sections provide that discovery can occur when Cadaret receives notice of a claim from a third party that may involve a covered loss, and they require Cadaret to inform Great American soon after receiving such notice. (J.A. 438 & 445.) The scenario contemplated by those provisions can arise when an insured sustains a direct loss because an employee steals a third party's property "from the insured[,]" *i.e.*, while the property is in the care or custody of the insured. *175 E. 74th Corp.*, 416 N.E.2d at 587-88. The fact that the bond acknowledges that possibility and requires Cadaret to give notice when a third party asserts a claim does not transform the bond into a liability policy.

### 2. Cadaret Cannot Satisfy the Manifest Intent Requirement.

Like the direct-causation standard, the requirement that an employee must have acted with the "manifest intent … to cause the Insured to sustain [a] loss" was

34

added to standard fidelity bond forms in 1980 to clarify, in part, that fidelity bonds do not cover third-party losses. Gammell, *supra*, at 79 (J.A. 869); Schmookler, *supra*, at 125-27 (J.A. 828-829). Coverage does not apply when an employee intends to cause a third party to sustain loss; it applies only when an employee's scheme is designed to cause the insured itself to sustain a direct loss. *See id.*

New York law is in accord with the historical purpose of the "manifest intent" requirement. New York courts have held that dishonest acts aimed at third parties are not covered because the "manifest intent" requirement is not satisfied when a dishonest employee targets a third party rather than the insured. *Cont'l Bank*, 626 N.Y.S.2d at 387; *Kidder Peabody*, 246 A.D.2d at 209. Indeed, this Court held that "[t]he manifest intent provision … limit[s] protection under this bond to losses due to embezzlement or embezzlement-like acts." *Glusband v. Fittin Cunningham & Lauzon, Inc.*, 892 F.2d 208, 212 (2d Cir. 1989).

Cadaret cannot satisfy the "manifest intent" requirement because the undisputed facts show Pagartanis's intent was to cause the customers, not Cadaret, to sustain losses. (J.A. 730:4-10, 731:6-13, 785-786, 992-993, 998-1001, 1014-1016, 1021-1023, 1036-1038, 1042-1045, 1057-1075, 1092:19-24, 1094:12-25, 1096:15-1097:7, 1099:10-1100:13, 1101:23-1102:23.) Pagartanis did not make any representations to suggest the customers' investments were transacted through Cadaret. (*Id.*) In fact, Pagartanis took affirmative steps to make it clear that Cadaret

35

was *not involved* with the investments by telling the customers to draft checks on outside, non-Cadaret accounts rather than transfer funds directly from Cadaret accounts. (*Id.*) As Cadaret itself explained in the FINRA proceedings: "It could not have been more clear to [the customers] that Cadaret had nothing to do with [their] purported investment[s.]" (J.A. 1001, 1023, 1045.)

Citing *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66 (2d Cir. 2000) ("*FDIC*"), Cadaret claims it established "manifest intent" on the grounds that "Pagartanis was 'substantially certain' Cadaret would ultimately bear the loss for his misappropriation." (Appellant's Br. at 46.) That argument does not make sense. Cadaret could sustain a loss only if Pagartanis failed at concealing his scheme. It would be irrational to assume Pagartanis was "substantially certain" his scheme would fail. As in *Cont'l Bank*, "[t]he last thing [Pagartanis] wanted was for [his] scheme to fail." 626 N.Y.S.2d at 387. The only rational conclusion is that Pagartanis did not want Cadaret to sustain a loss because it could only happen if Pagartanis' scheme had been foiled.

*FDIC* actually undercuts Cadaret's position. In that case, this Court explained that two prior cases are "properly interpreted as defining manifest intent to require that the insured establish that the employee acted with the specific purpose or object to harm the insured." 205 F.3d at 73. The Court held that manifest intent "can exist when a particular result is substantially certain to follow from the employee's

36

conduct[,]" but it did not illogically hold that an employee whose scheme would fail if his employer sustained a loss acted with the specific purpose of causing his employer to sustain a loss. *Id*.

Moreover, *FDIC* is factually distinguishable. The employee in that case admitted he personally believed his employer would sustain a loss if it continued to fund a development project because the employee knew but did not disclose that the general contractor was stealing from the project. *Id*. at 74-75. Thus, *FDIC* does not suggest an employee who targets third parties in a scheme that can succeed only if his employer does not sustain a loss somehow acts with the specific purpose causing the employer to sustain a loss.

The only other case Cadaret cites that analyzed a fidelity bond, *Nat'l Bank of Pakistan v. Basham*, 142 A.D.2d 532 (N.Y. App. Div. 1988), is inapposite.[2] In that case, a bank employee credited a customer's account for checks from a drawer whose prior checks had been dishonored. *Id*. at 532-33. When the new checks were also dishonored, the bank had a loss, which the employee covered up by transferring funds from another customer's account. *Id*. Unlike this case, therefore, the scheme was designed to cause, and then cover up, a direct loss to the insured. *Id*.

---

[2] Cadaret also cites, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 610 B.R. 197 (Bankr. S.D.N.Y. 2019), but that case did not even address an insurance dispute, let alone analyze the "manifest intent" requirement in fidelity bonds.

Finally, Cadaret claims Pagartanis intended to cause Cadaret to sustain a loss because he supposedly wrote a note to family members that states: "'Do not offer to pay anyone, let the broker dealers deal with it.'" (Appellant's Br. at 47 (quoting J.A. 588).) Cadaret's reliance on the supposed note fails for two reasons.

First, the "note" Cadaret's brief pretends to quote is not in the record and cannot be presented in a form that would be admissible at trial, as required under Rule 56(c)(2) of the Federal Rules of Civil Procedure. Instead, Cadaret cites a sentencing memorandum that purports to describe a note that was never produced in this case. (J.A. 588.) The sentencing memorandum is inadmissible under Rules 802 and 1002 of the Federal Rules of Evidence because the best evidence of the contents of the note is the note itself, and the statements in the sentencing memorandum that describe the note are hearsay.

Second, Cadaret's argument about the note is illogical. The fact that Pagartanis may have told family members to "let the brokers deal with it" after his scheme had already unraveled does not mean he intended for Cadaret to sustain a loss at the time he committed the dishonest acts. The only rational inference is that Pagartanis did not want his scheme to fail, and he did not want his victims to assert claims against Cadaret.

### 3.    The Stolen Funds Were Not Covered Property.

Coverage applies only to property that is "owned" or "held" by Cadaret, or "owned and held by someone else under circumstances which make [Cadaret] responsible for the Property prior to the occurrence of the loss." (J.A. 449.) Cadaret appears to concede it did not own the funds Pagartanis stole. Undisputed facts also confirm that Cadaret did not hold and was not responsible for those funds because they were not transferred from Cadaret accounts. (J.A. 730:4-10, 731:6-13, 1092:19-24, 1094:12-25, 1096:15-1097:7, 1099:10-100:13, 1101:23-1102:23.) Instead, the customers drafted checks on outside, non-Cadaret bank accounts to which Cadaret did not have access, over which Cadaret had no control, and for which Cadaret had no responsibility. (*Id*.) The funds, therefore, were not covered property at the time the losses occurred. *See*, *e.g.*, *RealPage, Inc.*, 21 F.4th at 297-300; *Lynch Properties, Inc. v. Potomac Ins. Co. of Illinois*, 140 F.3d 622, 626-30 (5th Cir. 1998).

Cadaret claims it "held" and was "responsible" for the funds, relying primarily on *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265 (6th Cir. 2012). *First Defiance*, however, directly undermines Cadaret's position. In *First Defiance*, the Sixth Circuit held that an insured is "responsible" for client funds if it has "authority over [the accounts]" and is authorized to initiate transactions in the accounts. *Id* at 268-69. It is undisputed that Cadaret did not have control over any of the accounts on which the relevant checks were drawn. (J.A. 731:6-13, 1094:12-25,

39

1097:3-7, 1101:23-1102:23.) Under the rationale of *First Defiance*, therefore, Cadaret did not hold and was not "responsible" for the stolen funds.

Furthermore, other courts have held that the mere ability to initiate transfers from an account held at a different financial institution does not mean the funds in the account are covered property. *RealPage, Inc.*, 21 F.4th at 297-300; *Lynch Properties, Inc.*, 140 F.3d at 626-30; *Loeb Properties, Inc. v. Fed. Ins. Co.*, 663 F. Supp. 2d 640, 645-49 (W.D. Tenn. 2009). Those cases are better aligned than *First Defiance* with the history of fidelity bonds and the interplay between the covered property condition, the direct-loss requirement, and the exclusion for third-party damages. *See Massachusetts Mut. Life Ins. Co*, 2010 WL 2929552, at *19-22. Reading those provisions together, the covered property condition "reaffirms" that the bond does not cover a third party's property unless "the insured held or was legally liable for a third party's property at the time of the loss." *Id*.

Tacitly acknowledging it did not hold any of the funds immediately before the losses, Cadaret suggests it became instantaneously responsible at the moment Pagartanis took funds because he "had authority to act as Cadaret's agent to request and accept funds from those clients for the purpose of Cadaret making investments[.]" (Appellant's Br. at 40.) Regardless of whether Cadaret gave Pagartanis general authority to accept funds, however, it simply is not what occurred. Pagartanis did nothing to suggest the sham investments were transacted through

40

Cadaret. (J.A. 992-993, 998-1001, 1014-1016, 1021-1023, 1036-1038, 1042-1045.) In Cadaret's own words: "It could not have been more clear to [the customers] that Cadaret had nothing to do with" the transactions. (J.A. 1001, 1023, 1045.)

The point is illustrated by a case Cadaret cites, *Ogilvie Sec. Advisors Corp. v. Fed. Ins. Co.*, No. 11 C 8554, 2013 WL 12625220 (N.D. Ill. Nov. 18, 2013). In *Ogilvie*, customers gave funds to the insured's employee for the purpose of investing them through the insured. *Id.* at *1. FINRA arbitrators ruled that, "when the clients placed their checks into [the employee's] hands, it was the same as placing the funds directly into [the insured's] hands." *Id.* at * 3-4. Based upon those facts, the court held the employee "in effect took the funds out of [the insured's] pocket[.]" *Id.*

The contrast between *Ogilvie* and this case is stark. Whereas the clients in *Ogilvie* transferred funds to the insured, Cadaret's customers did the opposite by transferring funds *from* Cadaret accounts to their own outside accounts. (J.A. 20-21 (¶ 31), 731:6-13, 785-786, 1057-1015, 1099:17-1100:13.) When they later drafted checks on the outside accounts and made them payable to non-Cadaret entities, the customers could not have believed they were transferring funds to Cadaret. Again, in Cadaret's own words, "[i]t could not have been more clear to [the customers] that Cadaret had nothing to do with" the transactions. (J.A. 1001, 1023, 1045.)

Cadaret also claims it was "responsible" for the funds based on contractual and fiduciary relationships. (Appellant's Br. at 41.) It is not clear, but Cadaret's point

41

appears to be that it was vicariously liable for Pagartanis' conduct because he was Cadaret's employee and it had a duty to supervise him. However, the fact that Cadaret may have been liable for Pagartanis' conduct, or may have breached a duty to supervise, does not mean Cadaret was "responsible" for the specific funds at issue at the time of the losses, as required for the funds to qualify as covered property.

Finally, Cadaret claims it held the funds "immediately prior to their theft" because at the time the customers transferred funds from their Cadaret accounts to their outside accounts, they were acting "at Pagartanis' direction as part of his overall scheme." (Appellant's Br. at 41.) Cadaret's contention that the customers sustained losses when they moved their own funds to their own outside accounts is untenable. They did not—and could not—sustain losses until Pagartanis negotiated the checks drawn on the outside accounts. Since Cadaret had no responsibility for those accounts, the funds were not covered property.

Moreover, Cadaret's argument that prior authorized transfers from Cadaret accounts to outside accounts were part of the scheme ignores the fact that the bond excludes "loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful withdrawal and conversion of Money … directly from a customer's account by an employee[.]" (J.A. 443.) If a customer's transfer of funds from a Cadaret account to an outside account was an integral part of a loss, as Cadaret contends, then the loss resulted "indirectly

42

from transactions in a customer's account" and is therefore excluded by Exclusion 2(i). (*See id.*) Cadaret cannot claim those transfers were part of the scheme for purposes of the covered property condition but not for purposes of Exclusion 2(i).

### 4. The Bond Excludes Damages for which Cadaret is Liable.

Section 2(t) is yet another provision the SAA added to the bond in 1980 to confirm it does not cover third-party losses. *Massachusetts Mut. Life Ins. Co.*, 2010 WL 2929552, at *16-17. It says the bond does not cover "damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." (J.A. 444.) As such, the settlement payments Cadaret made to avoid being held liable for damages are excluded. *Kidder Peabody*, 246 A.D.2d at 209-10.

Cadaret does not deny it made the settlement payments to avoid being held legally liable for damages suffered by third parties. In an attempt to avoid Exclusion 2(t), however, Cadaret invokes its exception for "conduct which would have caused a covered loss to [Cadaret] in a similar amount in the absence of such damages." (Appellant's Br. at 44.) Cadaret claims it "had an obligation to replace the funds[,]" supposedly "meaning that Cadaret suffered a covered Loss as soon as the funds were stolen, in the absence of any damages awarded for which Cadaret might ultimately be found legally liable." (Appellant's Br. at 44 (quotation omitted).)

43

Cadaret's argument fails for two reasons. First, the record does not support the contention that Cadaret was immediately responsible for replacing funds. In fact, Cadaret never replaced the funds; it denied liability and entered into settlement agreements years later. (J.A. 85-211.) The documents from the FINRA proceedings show that Cadaret paid deeply discounted amounts to settle disputed claims after hotly contesting liability. (*Id.*; *see*, *e.g.*, J.A. 131 (¶ 9), 86-105, 184-185.)

Second, Cadaret's logic is circular. If Cadaret was immediately responsible for replacing funds, as it contends, the reason must have been because Cadaret was legally liable to the customers for damages. Any such responsibility, therefore, cannot constitute a loss "in the absence of such damages." (J.A. 444.) Any loss to Cadaret is necessarily dependent upon the existence of damages.

The case upon which Cadaret principally relies, *Janney*, acknowledges the problem with its interpretation: "To the extent that this reasoning appears circular, it must be blamed on the lack of clarity in the terms of Exclusion (t) which renders them ambiguous in light of the other provisions of the Bond cited previously." 2019 WL 400533, at *4, n.17 (citation omitted). Instead of attempting to harmonize the relevant provisions, that court declined to enforce the exclusion.

The Pennsylvania trial court's opinion in *Janney* essentially wrote the exclusion out of the bond. New York law rejects that approach. Insurance policies must be interpreted in a way that "leaves no provision without force and effect[.]"

44

*In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1151 (N.Y. 2016) (quotation omitted). "Significantly, surplusage [is] a result to be avoided."[3] *Id.* (quotation omitted).

It is not difficult to make sense of Exclusion 2(t) and harmonize it with the other provisions in the bond. As explained in Section I.B.1., the general references to liability in the bond state only that discovery can occur when Cadaret receives notice of a claim from a third party that may involve a covered loss and that Cadaret must provide notice soon thereafter. (J.A. 438 & 445.) The scenario contemplated by those provisions arises when an insured sustains a direct loss because an employee steals a third party's property "from the insured[,]" *i.e.*, while the property is in the care or custody of the insured. *175 E. 74th Corp.*, 416 N.E.2d at 587-88. That is the exact scenario that is carved out of Exclusion 2(t) by the exception for "conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." (J.A. 444.) Thus, the provisions discussed in *Janney* can easily be reconciled and given full effect.

### 5. The Bond Excludes Losses from Customer Accounts Except Direct Embezzlement.

Section 2(i) excludes "loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful

---

[3] Moreover, the *contra proferentem* rule upon which the *Janney* court relied should not apply to fidelity bonds for the reasons previously explained. *French Am. Banking Corp.*, 752 F. Supp. at 89 n.6.

withdrawal and conversion of Money … directly from a customer's account by an employee[.]" (J.A. 443.) As previously explained, Cadaret claims the transfer of funds by its customers from Cadaret accounts to their own outside, non-Cadaret accounts was an integral part of the loss. (Appellant's Br. at 41.) Great American disagrees because the customers would not have sustained any losses if they did not subsequently draft checks on their outside accounts. If the Court agrees with Cadaret, however, then the losses are subject to Exclusion 2(i) because they resulted "indirectly from transactions in a customer's account," *i.e.*, the transfers from Cadaret accounts to outside accounts. (J.A. 443.)

Cadaret's appeal brief ignores Exclusion 2(i), but Cadaret previously relied on *Raymond James Fin., Inc. v. Fed. Ins. Co.*, No. 20-21707-CIV, 2022 WL 4767779 (S.D. Fla. July 22, 2022), to argue that Exclusion 2(i) does not apply. That case interpreted the term "transaction" to mean "an exchange" and not "a unilateral transfer of funds to another account[.]" *Id.* at *7. Cadaret argued that the transfers from Cadaret accounts to the customers' outside accounts were unilateral transfers and therefore did not qualify as "transactions" under the exclusion.

*Raymond James Fin., Inc.*'s holding that the term "transaction" does not apply to a unilateral transfer from one account to another violates the rule against "surplusage[.]" *In re Viking Pump, Inc.*, 52 N.E.3d at 1151 (quotation omitted). Exclusion 2(i) contains an exception that applies to a specific type of unilateral

46

transfer: "the unlawful withdrawal and conversion … directly from a customer's account by an employee[.]" (J.A. 443.) The fact that unilateral withdrawals initiated by employees are expressly carved out from the exclusion clearly demonstrates that unilateral withdrawals are subject to the exclusion in the first instance, and therefore qualify as "transactions." Any other interpretation would render the exception unnecessary "surplusage[,]" which is impermissible under New York law. *In re Viking Pump, Inc.*, 52 N.E.3d at 1151 (quotation omitted).

## II.    THE JUDGMENT IS SUPPORTED BY ALTERNATIVE GROUNDS.

### A.    Coverage for Pagartanis Terminated Immediately upon Inception of the Bond.

The bond provides that coverage for a specific employee automatically terminates as soon as Cadaret "learns of any dishonest or fraudulent act" by that employee. (J.A. 446.) The prior discovery of any dishonest act terminates coverage regardless of whether the prior dishonesty caused an actual loss to the insured or anybody else. *Cap. Bank & Tr. Co.*, 91 A.D.3d at 1253-54.

The bond did not incept until November 1, 2017. (J.A. 443.) Cadaret's own pleadings in the Abramovich proceeding prove Cadaret knew Pagartanis committed dishonest acts long before the bond incepted. (J.A. 952-953, 960-961, 1081:6-19, 1084:3-16.) On May 10, 2017, Cadaret filed an answer expressly stating that Pagartanis "blatantly lied" and used "deceitful and surreptitious means" to conceal

his scheme. (*Id.*) Accordingly, coverage for Pagartanis terminated before the bond even incepted.

Cadaret appears to concede coverage for Pagartanis terminated before the bond incepted but argues that the effect of such termination is prospective only. (*See* Appellant's Br. at 51.) When coverage for a specific employee terminates *during the bond period*, it is true that the termination is "without prejudice to the loss of any Property then in transit in the custody of such person[.]" (J.A. 446.) In other words, the termination is forward-looking, which makes sense because the employee was covered under the bond from the date of its inception until the date on which the insured learned of the employee's dishonesty.

A different issue is presented when the insured discovers an employee's dishonesty before a bond even incepts because coverage for the employee never attaches in the first place. In that circumstance, coverage terminates "immediately upon inception of the bond" such that all losses caused by the employee are excluded regardless of when they occurred. *Cap. Bank & Tr. Co.*, 91 A.D.3d at 1253-1254; *Nat'l Credit Union Admin. Bd. v. Cumis Ins. Soc'y Inc.*, 689 F. App'x 428, 436 (6th Cir. 2017); *C. Douglas Wilson & Co. v. Ins. Co. of N. Am.*, 590 F.2d 1275, 1279 (4th Cir. 1979); *Starr Ins. Holdings, Inc. v. U.S. Specialty Ins. Co.*, 185 A.D.3d 488, 489 (N.Y. App. 2020); *Drexel Burnham Lambert Grp., Inc.*, 595 N.Y.S.2d at 208-09; *United Association Union Loc. No. 290 v. Fed. Ins. Co.*, No. CIV.07-1521-HA, 2008

48

WL 3523271, at \*8 (D. Or. Aug. 11, 2008); *Cooper Sportswear Mfg. Co. v. Hartford Cas. Ins. Co.*, 818 F. Supp. 721, 725 (D.N.J.), *aff'd*, 16 F.3d 403 (3d Cir. 1993); *Verneco, Inc. v. Fid. & Cas. Co. of N.Y.*, 219 So. 2d 508, 510-11 (La. 1969). Cadaret does not cite a single case that held otherwise.

The termination-upon-inception rule is necessary to prevent insureds from concealing known risks when applying for insurance to cover losses caused by employees the insureds already know are dishonest. *Nat'l Credit Union Admin. Bd.*, 689 F. App'x at 436-37. As the Sixth Circuit noted, Cadaret's interpretation would encourage "insurance fraud, and it would ill behoove [the Court] to endorse [insurance fraud] in an overly reductive interpretation of policy provisions." *Id.*

The rule that coverage never attaches for an employee known to be dishonest prior to a bond's inception is not a recent judicial invention; it is rooted in common law principles of suretyship. Norbert Wegerzyn & John Morrissey, *Fidelity Insurance Policies: Yesterday, Today, and Tomorrow*, in HANDLING FIDELITY BOND CLAIMS, 1, 2-8 (Michael Keeley & Timothy M. Sukel, eds. 1999) (J.A. 891-897).[4] Under surety law, a creditor's failure to disclose facts that materially increase the risk, and that were known by the creditor before the bond incepted, is a defense. *Id.* (citing Restatement (First) of Security § 124(1) (1941)). Applying that principle to

---

[4] Historically, fidelity insurance developed as a specialized form of suretyship. *Id.*; Heinbokel, *supra*, at 577-78 (J.A. 800-801). In fact, the term "'fidelity bond' evolved out of personal suretyship[.]" *Id.*

fidelity bonds, an insured's pre-bond knowledge of an employee's dishonesty materially increases the risk, and the insured's failure to disclose it is a defense.

Since Cadaret knew about Pagartanis' dishonesty long before November 1, 2017, coverage terminated "immediately upon inception of the bond[.]" *Cap. Bank & Tr. Co.*, 91 A.D.3d at 1253-1254. Accordingly, the bond never covered Pagartanis.

## B. Cadaret Discovered the Loss Before the Bond Period.

The bond applies only to "loss first discovered by [Cadaret] during the Bond Period" beginning November 1, 2017. (J.A. 445.) Discovery occurs "when [Cadaret] first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known." (*Id*.)

Cadaret discovered the loss at issue no later than May 10, 2017, when it affirmatively claimed Pagartanis "blatantly lied" and used "deceitful and surreptitious means" to conceal his scheme. (J.A. 952-953, 960-961, 1081:6-19, 1084:3-16.) As of that date, Cadaret already knew all the details of the Ponzi scheme because Abramovich's statement of claim alleged that Pagartanis used the exact

same *modus operandi* to steal from Abramovich that the other customers described.[5] (*Compare* J.A. 933-941, *with* J.A. 20-21 (¶ 31), 785-786, 1057-1075.)

Cadaret argues the facts it knew in the Spring of 2017 were not sufficient to trigger discovery on the grounds that Abramovich did not claim she suffered a financial loss, and Cadaret supposedly did not know Sonesta and Kinnico were fictitious companies. (Appellant's Br. at 47-50.) That argument cannot be squared with the plain language of the bond or controlling law.

The bond does not say an insured must have actual knowledge of a loss to trigger discovery. (J.A. 445.) Instead, discovery occurs when the insured is "aware" of facts that would cause a "reasonable person" to "assume" a loss occurred. (*Id*.) Discovery, therefore, is not based on Cadaret's subjective beliefs, even if held in good faith. *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*, 748 F.2d 118, 120-23 (2d Cir. 1984). Instead, discovery is determined "according to an objective test, based on the conclusions that a reasonable person would draw from the facts known to the insured." *Id*.

Additionally, Cadaret had a "duty to inquire" and cannot "disregard the known facts" or ignore facts that it "should have known[.]" *Id*.; *Hudson Ins. Co. v. Oppenheim*, 81 A.D.3d 427, 428 (N.Y. App. Div. 2011) (finding a "duty to exercise

---

[5] All losses caused by "all acts or omissions … by any person (whether an employee or not)" constitute a "Single Loss" under the bond. (J.A. 446.) Accordingly, Pagartanis' scheme did not involve separate occurrences.

51

reasonable diligence to acquire knowledge of covered losses") (quotation omitted); *see also Guarantee Co. of N. Am. v. Mechanics' Sav. Bank & Tr. Co.*, 183 U.S. 402, 420 (1902) (equating being "aware" with "reason for inquiry").

The facts Cadaret knew and should have known on May 10, 2017, were more than enough to cause a reasonable person to assume a loss occurred. Although Cadaret suggests it did not believe Sonesta and Kinnico were sham companies, any such belief was unreasonable in light of Abramovich's allegations that Pagartanis refused to provide documentation proving the companies existed. (J.A. 939-941.) If Cadaret, who had a duty to inquire, simply searched its own files and public records, it would have known Sonesta was owned by Pagartanis. (J.A. 701-702, 732:8-14, 734:5-735:8, 772-777.) The fact that Cadaret buried its head in the sand instead of inquiring did not prevent discovery. *Utica Mut. Ins. Co.*, 748 F.2d at 120-23.

The only other fact Cadaret claims it was missing in May of 2017 is the existence of a "loss of money" to Abramovich. (Appellant's Br. at 48.) The fact that Pagartanis eventually returned funds to Abramovich, however, is consistent with a Ponzi scheme. (J.A. 1086:17-1087:11.) The attorney who represented Cadaret in the FINRA proceedings agrees:

> Q. If somebody is running a Ponzi scheme, it wouldn't be unusual for an earlier investor who demands money back to receive money back; is that fair?
> A. That's fair to say.
> Q. And that's because the nature of the scheme is, as you say, robbing one investor to pay back another investor, correct?

52

A. Correct.

(*Id.*) Accordingly, the fact that Pagartanis sent money to Abramovich did not negate any of the red flags Cadaret knew about as of May 10, 2017.

### C. Cadaret Failed to Comply with Section 5 of the Bond.

Upon discovering the loss by May 10, 2017, the bond required Cadaret to give notice within thirty days and submit a sworn proof of loss within six months. (J.A. 446.) Cadaret breached those provisions because it did not even give notice, let alone a proof of loss, until April 18, 2018, almost a year after discovery. (J.A. 779.) As a result, Cadaret cannot recover under the bond. *Utica Mut. Ins. Co.*, 748 F.2d at 123.

### D. Cadaret's Complaint Is Time-Barred.

Section 5 of the bond has a contractual limitations period requiring Cadaret to initiate any legal proceedings within two years of discovering a loss. (J.A. 446.) As demonstrated above, Cadaret discovered the loss by May 10, 2017, and provided notice to Great American on April 18, 2021. It did not sue, however, until December 1, 2021. (J.A. 1-2.) The complaint is therefore time-barred. *Redington v. Hartford Acc. & Indem. Co.*, 463 F. Supp. 83, 86 (S.D.N.Y. 1978).

### CONCLUSION

This Court should affirm the entry of summary judgment because the District Court correctly held the bond does not cover settlement payments Cadaret made to avoid being held liable for third-party losses. Alternatively, the Court should affirm

the entry of summary judgment because the bond does not cover Pagartanis, Cadaret discovered the loss before the bond period, Cadaret breached the conditions requiring timely notice and proof of loss, and the complaint is time-barred.

Dated:   March 27, 2026

Respectfully submitted,

*/s/ Michael A. Graziano*

Michael A. Graziano
Eckert, Seamans, Cherin & Mellott,
LLC 1717 Pennsylvania Avenue, NW,
12th Floor
Washington, DC 20006
(202) 659-6600

*Attorneys for Defendant-Appellee*

54

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,875 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch and Times New Roman.

Dated: March 27, 2026

*/s/ Michael A. Graziano*
_____
Michael A. Graziano

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the ACMS system. All participants are registered e-filing users and will be served by the e-filing system.

Dated: March 27, 2026

/s/ *Michael A. Graziano*
Michael A. Graziano