# 25-2639

## In the United States Court of Appeals

### FOR THE SECOND CIRCUIT

CADARET, GRANT & CO., INC.,

*Plaintiff - Appellant*,

v.

GREAT AMERICAN INSURANCE COMPANY,

*Defendant – Appellee*.

On Appeal from the United States District Court for the
Eastern District of New York, No. 21-cv-6665, Hon. Ramón E. Reyes, Jr.

## REPLY BRIEF OF APPELLANT

John N. Ellison
REED SMITH LLP
599 Lexington Avenue
22nd Floor
New York, NY 10022
Tel.: (212) 521-5400
Fax: (212) 521-5450
jellison@reedsmith.com

*Counsel for Appellant*
*CADARET GRANT & CO., INC.*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................1

I. ARGUMENT............................................................................................4

    A. The Record Supports That Cadaret Sustained a Direct Loss
       Covered by the Bond.......................................................................4

        1. The Doctrine of *Contra Proferentem* Applies Under New
           York Law. ...........................................................................4

        2. *175 E. 74th Corp.* Does Not Foreclose Coverage. ....................6

        3. *MF Global* Controls and Supports Coverage for
           Cadaret's Direct Loss............................................................10

        4. Cadaret's Position is Supported by Authoritative
           Insurance Treatises................................................................12

        5. The Bond's "Resulting Directly From" Language Does
           Not Bar Coverage..................................................................15

        6. Cadaret Satisfies the Manifest Intent Requirement. .................18

        7. The Stolen Funds Were Covered Property. .............................20

        8. No Exclusions Bar Coverage for Cadaret's Loss. ....................22

           a. Exclusion 2(t) Does Not Bar Coverage.........................22

           b. Exclusion 2(i) Does Not Bar Coverage.........................24

        9. GAIC's Alternative Grounds Are Without Merit.....................26

CONCLUSION.................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*175 E. 74th Corp. v. Hartford Acc. & Indem. Co.*,
    51 N.Y.2d 585 (1980) ..................................................................................6, 7

*Aetna Casualty & Surety Company v. Kidder, Peabody & Co. Inc.*,
    246 A.D.2d 202 (1st Dep't 1998) ...........................................................17

*B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*,
    354 F. Supp. 2d 284 (S.D.N.Y. 2004) ....................................................19

*In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.)*,
    971 F.2d 831 (2d Cir. 1992) .................................................................12

*Continental Bank, N.A. v. Aetna Casualty & Surety Co.*,
    626 N.Y.S.2d 385 (N.Y. Sup. Ct. 1995)...................................................9

*Cummins, Inc. v. Atl. Mut. Ins. Co.*,
    56 A.D.3d 288 (1st Dep't 2008) ........................................................4, 5

*Dean v. Tower Ins. Co. of N.Y.*,
    19 N.Y.3d 704 (2012) ..............................................................6, 16, 22

*Ernst & Young LLP v. National Union Fire Insurance Co.*,
    304 A.D.2d 410 (1st Dep't 2003) ...........................................................9

*F.D.I.C. v. Nat'l Union Fire Ins. Co.*,
    205 F.3d 66 (2d Cir. 2000) .................................................................18

*First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*,
    688 F.3d 265 (6th Cir. 2012) .........................................................15, 21

*Gasperini v. Ctr. For Humanities, Inc.*,
    518 U.S. 415 (1996)............................................................................11

*Givati v. Air Techniques, Inc.*,
    104 A.D.3d 644 (2d Dep't 2013)...........................................................23

*Janney Montgomery Scott LLC v. Nat'l Union Fire Ins. Co., No. 00130 Comm. Prgm.*,
2019 Phila. Ct. Com. Pl. LEXIS 9 (Pa. Ct. Com. Pl. Jan. 22, 2019)........9, 23, 27

*Loeb Props. v. Fed. Ins. Co.*,
663 F. Supp. 2d 640 (W.D. Tenn. 2009) ...........................................................21

*Lynch Properties Inc. v. Potomac Insurance Co. of Illinois*,
140 F.3d 622 (5th Cir. 1998) ..............................................................................21

*Macey v. Carolina Cas. Ins. Co.*,
674 F.3d 125 (2d Cir. 2010) ..................................................................................4

*McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*,
857 F.3d 141 (2d Cir. 2017) ..............................................................................6, 8

*Morgan Stanley Grp. Inc. v. New England Ins. Co*,
225 F.3d 270 (2d Cir. 2000) ..................................................................................5

*New Hampshire Insurance Company v. MF Global Financial USA Inc.*,
204 A.D.3d 141 (1st Dep't 2022) .................................................................*passim*

*Ogilvie Security Advisors Corporation v. Federal Insurance Company*,
No. 11 C 8554, 2013 U.S. Dist. LEXIS 209478 (N.D. Ill. Nov. 18, 2023) ................................................................................................................14, 21

*Paskar v. City of N.Y.*,
3 F. Supp. 3d 129 (S.D.N.Y. 2014) ....................................................................19

*RealPage, Inc. v. Nat'l Union Fire Ins. Co.*,
21 F.4th 294 (5th Cir. 2021) ..............................................................................21

*Richardson v. N.Y.C. Board of Ed.*,
711 F. App'x 11 (2d Cir. 2017)...........................................................................19

*Rothschild Inv. Corp. v. Travelers Cas. & Sur. Co. of Am.*,
No. 05 C 3041, 2006 U.S. Dist. LEXIS 30033 (N.D. Ill. May 4, 2006) ................................................................................................................25

*Schering Corp. v. Home Ins. Co.*,
712 F.2d 4 (2d Cir. 1983) ......................................................................................6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
    610 B.R. 197 (Bankr. S.D.N.Y. 2019)....................................................................19

*In re Viking Pump, Inc.*,
    52 N.E.3d 1144 (N.Y. 2016)...........................................................................23

*Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*,
    74 A.D.3d 551 (1st Dep't 2010) .........................................................................4

*Zappulla v. Annucci*,
    636 Fed. Appx. 824 (2d. Cir. 2016)........................................................4, 24, 26

**Rules**

Fed. R. Evid. 201(b)..............................................................................................19

**Other Authorities**

10 New Appleman on Insurance Law Library Edition § 111.01[f]...............2, 13, 14

2 New Appleman New York Insurance Law § 29.14 (2026) ...................................3

11A Couch on Insurance Third Edition § 161:58 (2025).........................................3

**INTRODUCTION**

Defeating the entire purpose of a broker-dealer's regulatorily required fidelity bond, GAIC's brief makes clear that if the lower court's ruling is affirmed, the financial institution bond required by the regulatory body that oversees broker-dealers, the Financial Institution Regulatory Authority ("FINRA"), for the protection of their clients and the broker-dealers themselves against dishonest thefts by registered representatives, would be rendered illusory to those constituencies for the very purpose it is designed to protect.  GAIC asks this Court to hold that when a registered representative of a broker-dealer runs a Ponzi scheme and steals funds from the broker-dealer's own customers—inducing them to liquidate their brokerage accounts and funnel the proceeds into sham entities for the personal benefit of the registered representative only—the broker-dealer's direct losses due to the scheme are not covered under the regulatorily-required financial institution bond like the one that GAIC sold Cadaret (the "Bond").  This result defies the purpose and intent of the regulatorily-required fidelity bonds, the plain language of the bond which covers direct losses to the broker-dealer and the controlling New York authority incorrectly interpreted by the district court, *New Hampshire Insurance Company v. MF Global Financial USA Inc.*, 204 A.D.3d 141, 153 (1st Dep't 2022) ("*MF Global*").

Moreover, as did the district court, GAIC mischaracterizes the facts of this case in stating that Cadaret "had no control over the outside accounts on which the

- 1 -

[customer's] checks were drawn," Appellee Br. (Dkt. 28.1) ("GAIC Br.") at 1. This erroneous statement with which GAIC leads in its brief simply ignores the clear evidence in the record that Steven Pagartanis convinced Cadaret's customers to allow him to withdraw funds from accounts held at Cadaret, in addition to outside accounts. GAIC propounds this factual misstatement because it understands that this fact is fatal to its position that this case only concerns Cadaret's legal liability for third-party claims, rather than the <u>direct loss</u> suffered by Cadaret due to Pagartanis' dishonesty ("Cadaret's Loss").

GAIC also mischaracterizes financial institution bonds as limited first-party indemnity instruments that can never, under any circumstances, respond to losses arising from employee dishonesty directed at third parties. Yet, this absolutist position has been rejected as a matter of New York law by the New York Appellate Division in *MF Global*, which held that coverage can attach where the policyholder itself sustains a direct loss as a consequence of employee misconduct, even when third parties are also harmed. Moreover, a plethora of authoritative insurance treatises uniformly recognize that the self-interested myth that GAIC and its fellow conflicted industry amicus spawn here has no validity whatsoever. *See, e.g.*, 10 New Appleman on Insurance Law Library Edition § 111.01[f] (recognizing while "the bond [ ] does not provide coverage for the insured's liability to third parties," "[a fidelity] bond may provide coverage in certain circumstances for the loss of a third

party's funds or property while in the possession of the insured."); 11A Couch on Insurance Third Edition § 161:58 (2025) ("A loss must be sustained by the insured and not a customer, stockholder or creditor, *unless* the insured compensates that party for its loss and thereby suffers a loss itself by virtue of the payment."); 2 New Appleman New York Insurance Law § 29.14 (2026) ("a bond insuring against loss sustained by reason of dishonesty, fraud, embezzlement, and so forth, covers losses imposed by the creation of liability to third persons").[1]

Contrary to GAIC's assertions and the district court's erroneous record interpretations, the record in this matter demonstrates that: 1) Cadaret suffered a direct loss under the Bond; 2) the funds Pagartanis stole from Cadaret's customers are covered property under the Bond; 3) Pagartanis acted with manifest intent to cause Cadaret loss; and 4) neither the Bond's exclusion 2(i) nor 2(t) bar coverage for Cadaret's Loss. Thus, the Court should reverse the district court's ruling granting summary judgment in favor of GAIC and denying Cadaret's motion for partial

---

[1] This correct view of the Bond's scope of coverage is reinforced when one reviews the exclusions in the Bond for the bondholder's legal liability. Specifically, exclusion 2(t) excludes "damages of any type for which the Insured is legally liable." JA444 (Bond). This does not mean, though, that *all* loss of third party's funds or property are excluded. Importantly, there is an exception to exclusion 2(t) where "the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." *Id.* Thus, the Bond covers a loss to the policyholder from a loss of a third party's funds that falls under this exception. Here, Cadaret's Loss does not merely arise out of legal liability, but out of a loss of a third party's funds in its possession when its dishonest employee stole customer funds from Cadaret accounts for sham investments for his own personal benefit which is squarely covered under the express terms of the financial institution bond that GAIC sold.

summary judgment. At a bare minimum, the record demonstrates there are genuine issues of material fact as to whether Cadaret's Loss is direct and the client funds Pagartanis stole are "covered property" under the Bond, which preclude a grant of summary judgment in favor of GAIC.[2]

## I.  ARGUMENT

### A.  The Record Supports That Cadaret Sustained a Direct Loss Covered by the Bond.

#### 1.  The Doctrine of *Contra Proferentem* Applies Under New York Law.

Portending its overriding theme of misleading the Court on the factual and legal matters at issue, GAIC incorrectly argues that the rule of *contra proferentem*, i.e. any ambiguities in an insurance contract must be construed against the insurer, does not apply here because Cadaret is a "sophisticated policyholder." GAIC Br. at 22. GAIC cites to *Cummins, Inc. v. Atl. Mut. Ins. Co.*, 56 A.D.3d 288, 290 (1st Dep't 2008), and other cases, such as *Westchester Fire Ins. Co. v. MCI Commc'ns Corp.*, 74 A.D.3d 551, 551 (1st Dep't 2010), which rely upon *Cummins*. In *Cummins*, however, the Appellate Division declined to apply *contra proferentem* because "the basic concept and terms [of the policy] originated with" the policyholder, which was

---

[2] Concerning GAIC's arguments on alternative grounds, i.e. those relating to termination of the Bond, discovery of Cadaret's Loss, Cadaret's compliance with Section 5 of the Bond, and whether Cadaret's complaint is time-barred, the Court should not consider these arguments as they were not addressed by the district court in the first instance. *See* GAIC Br. at 47-53. *See also Zappulla v. Annucci*, 636 Fed. Appx. 824, 825 (2d. Cir. 2016) (declining to address alternative arguments not addressed by the district court in the first instance and noting this Court "generally will not review an issue the district court did not decide") (quoting *Macey v. Carolina Cas. Ins. Co.*, 674 F.3d 125, 131 (2d Cir. 2010).

"instrumental in crafting various parts of the agreement." 56 A.D.3d at 290. Thus, New York courts only recognize that a narrow exception to *contra proferentem* may be made, if at all, where the policyholder had actually drafted and negotiated the specific policy language at issue.

In *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, this Court recognized that "there is no general rule in New York denying sophisticated businesses the benefit of contra proferentem." 225 F.3d 270, 279 (2d Cir. 2000). This Court held that Morgan Stanley, although a sophisticated entity, was potentially entitled to the benefit of *contra proferentem* "because Morgan Stanley did not negotiate its coverage terms." *Id.* at 280.

Here, Cadaret did not negotiate the coverage terms. This fact is confirmed by GAIC's potential amicus support, the Surety and Fidelity Insurance Association of America ("SFAA"), which demonstrates in its filing that the Bond here is a standard form insurance contract that the industry has drafted without Cadaret's involvement. SFAA Mot. For Leave to File Brief as Amicus Curiae (Dkt 30.1) at 6 ("SFAA, in collaboration with other trade organizations (such as the American Bankers Association) publishes standard-form fidelity and crime insurance policies widely used by its members, long-standing key language of which is at issue in this case").[3]

---

[3] Cadaret has filed an opposition to the SFAA's motion for leave to file an amicus brief and objects to the Court's consideration of the merits of the proposed amicus brief. However, Cadaret acknowledges that the Court may take judicial notice of the factual admission SFAA makes, which

Moreover, the cases that GAIC cites to state that *contra proferentem* does not apply to fidelity bonds, such as *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir. 1983), merely state that "*contra preferentem* is used [ ] after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." Here, to the extent any Bond language remains ambiguous, the doctrine of *contra proferentem* applies. In addition, under New York law, "[i]nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured." *Dean v. Tower Ins. Co. of N.Y.*, 19 N.Y.3d 704, 708 (2012).

### 2. *175 E. 74th Corp.* Does Not Foreclose Coverage.

GAIC relies heavily on *175 E. 74th Corp. v. Hartford Acc. & Indem. Co.*, 51 N.Y.2d 585 (1980), for the proposition that fidelity bonds do not insure against so-called "third party" liability for an employee's misconduct. In fact, though, this authority actually supports Cadaret's arguments here because *175 E. 74th Corp.* recognizes that employee dishonesty coverage insures "against loss of property, owned by or belonging to the insured or *others*, through employee dishonesty" (emphasis added), and coverage attaches when property is "misappropriated from the insured, irrespective of the capacity in which the insured holds it." *Id.* at 593.

_____

supports that the doctrine of *contra proferentem* applies. *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 148 (2d Cir. 2017) (noting that the Court may take judicial notice of statements in an *amicus* brief).

- 6 -

That is precisely what occurred here. Pagartanis, acting as Cadaret's registered representative and agent, induced customers to authorize him to liquidate their Cadaret brokerage accounts and redirect those funds into fraudulent entities Pagartanis controlled.[4] *175 E. 74th Corp.* is distinguishable because it concerned whether a fidelity bond permits a direct action against the insurance company by a third party upon the insolvency of the policyholder. In that case, the plaintiff alleged that the policyholder was its agent and commenced an action against the insurance company. Here, unlike the plaintiff in *175 E. 74th Corp.,* Cadaret is the policyholder that is not seeking coverage solely for its third-party legal liability to its customers. Cadaret was intertwined with every stage of Pagartanis' scheme as follows:

- The clients, Pagartanis, and Cadaret had a relationship that <u>pre-existed</u> Pagartanis' misappropriation of the client money;[5]
- Pagartanis was a registered representative of Cadaret;[6]
- Cadaret clients signed account agreements that named Pagartanis as the clients' "Investment Professional" and were signed on behalf of Cadaret;[7]
- Based on Pagertanis' lies to them, Cadaret clients transferred funds from Cadaret brokerage accounts to Pagartanis;[8]
- Pagartanis used the stolen client funds for illicit criminal activity for his own personal benefit;[9] and

---

[4] JA421-JA422 (Taylor Dep. Tr.), at 20:21-21:3; JA53 (Cohen Dep. Tr.), at 46:10-15; JA55-JA57 (Cohen Dep. Tr.), at 61:18-63:14; JA88 (Rothschild Statement of Claim); JA550-JA551 (Guilty Plea Tr.), at 21:18-22:6.

[5] *See, e.g.*, JA1136-1142 (Zagaro Statement of Claim Exhibit B).

[6] JA418-JA419 (Taylor Dep. Tr.), at 14:16-15:2; JA424-JA425 (Taylor Dep. Tr.), at 76:17-77:13; JA507-JA508 (Cohen Dep. Tr.), at 112:16-113:16.

[7] *See, e.g.*, JA1136-1142 (Zagaro Statement of Claim Exhibit B).

[8] JA567 (Pagartanis Indictment), at ¶ 5; JA569-JA570 (Pagartanis Indictment), at ¶¶ 20, 21.

[9] JA62 (Cohen Dep. Tr.), at 111:20-24; JA65 (Cohen Dep. Tr.), at 114:12-20; JA587 (Sentencing Memorandum); JA488 (Szary 30(b)(6) Dep. Tr.), at 53:2-5.

- The clients sought to hold Cadaret responsible for the reimbursement of their stolen money from Cadaret accounts.[10]

Moreover, GAIC further ignores a critical and dispositive fact in its brief. Although GAIC attempts to cherry-pick incomplete citations to parts of the record to provide an inaccurate and erroneous description of what actually occurred, even the parts of the record that GAIC cites to itself (*e,g*., JA 1094:18-22) establish the indisputable fact that **the stolen customer funds in many instances originated out of <u>Cadaret</u>-controlled accounts.**[11] These funds were then transferred at the direction of Pagartanis, Cadaret's agent, and misappropriated by Pagartanis for his own personal benefit as part of his criminal scheme. Instead of accurately portraying what the record shows transpired below, however, GAIC instead opts for deceiving this Court into believing that Pagartanis solely took customers' money by "negotiating checks that were drawn on the customers' outside accounts to which Cadaret had no access." GAIC Br. at 1. GAIC's attempted sleight of hand in ignoring the numerous record cites in Cadaret's opening brief demonstrating that customers transferred funds from their Cadaret accounts,[12] as well as the district

---

[10] JA108-JA182 (Client Claims).

[11] JA421-JA422 (Taylor Dep. Tr.), at 20:21-21:3; JA53 (Cohen Dep. Tr.), at 46:10-15; JA55-JA57 (Cohen Dep. Tr.), at 61:18-63:14; JA88 (Rothschild Statement of Claim); JA550-JA551 (Guilty Plea Tr.), at 21:18-22:6.

[12] *See id.*

court's adoption of these incorrect facts,[13] warrant reversal all alone, as these facts make apparent that the district court's ruling that no direct loss occurred are at least the subject of a material factual dispute that cannot be resolved on summary judgment.[14] The fact that customers transferred funds from their Cadaret accounts is critical, as it demonstrates that Cadaret suffered a <u>direct</u> loss of funds from its customer accounts. *MF Global*, 204 A.D.3d at 153.

GAIC's attempt to reduce *175 E. 74th Corp.* to a rigid rule that coverage never extends to any claim under a fidelity bond where a third party was also harmed also fails. The New York Court of Appeals held only that a fidelity bond does not "transform … into one indemnifying against liability" merely because "the insured may be liable to a third party." 51 N.Y.2d at 593. That is an accurate statement of New York law as far as it goes, but that rule is not dispositive of the outcome here on very different facts from those at issue in *175 E. 74th Corp.*[15] The critical question

---

[13] SA1 (District Court Memorandum and Order) at 13 ("First, the client funds were held in clients' personal bank accounts at the time of the theft, not in any entity connected to Cadaret or accessible by Cadaret's advisors, including Pagartanis.")

[14] *See, e.g., Janney Montgomery Scott LLC v. Nat'l Union Fire Ins. Co.*, No. 00130 Comm. Prgm., 2019 Phila. Ct. Com. Pl. LEXIS 9, at *7 (Pa. Ct. Com. Pl. Jan. 22, 2019) (holding whether there is coverage under a financial institutions bond must be established at trial where there was evidence that a significant portion of investment funds that a former employee stole from clients was held by the broker dealer in its accounts prior to being withdrawn and stolen by the former employee).

[15] The other cases that GAIC cites are also factually distinguishable. *Continental Bank, N.A. v. Aetna Casualty & Surety Co.*, 626 N.Y.S.2d 385, 386 (N.Y. Sup. Ct. 1995), involved employees' unauthorized margin trading in customer accounts that did not result in any loss or theft of customer funds. In addition, the plaintiff in *Ernst & Young LLP v. National Union Fire Insurance Co.* sought "fees, costs and lost interest" resulting from the theft of client funds and not coverage due to the reimbursement of the stolen client funds themselves. 304 A.D.2d 410 (1st Dep't 2003).

is whether the bondholder *itself* sustained a direct loss—not whether a third party also had a claim. Here, Cadaret suffered a direct loss, or at a minimum, presented a fact question as to whether Cadaret did suffer one. Thus, the district court's failure to acknowledge the existence of a factual record that could support a factual finding of a "direct loss" within the Bond's express terms compels reversal of its award of summary judgment in GAIC's favor.

### 3. *MF Global* Controls and Supports Coverage for Cadaret's Direct Loss.

GAIC also incorrectly dismisses the most factually analogous New York authority, *MF Global.* In *MF Global*, the New York Appellate Division's First Department held that coverage attached because the policyholder experienced a direct financial loss as a consequence of employee misconduct, independent of the question of whether any third-party liability existed. 204 A.D.3d at 148-51. Specifically, the court ruled that a broker's conduct in making unauthorized trades beyond his margin was the direct and proximate cause of the broker-dealer's loss, which was covered under the bond.

Here, the moment Pagartanis induced and took Cadaret's customers' funds from their Cadaret brokerage accounts and fraudulently funneled those funds into entities he controlled for his personal benefit, Cadaret also experienced a direct

loss.[16]  In *MF Global*, as a broker and clearing member of the Chicago Mercantile Exchange, MF Global <u>assumed complete responsibility</u> for the financial obligations of CME trades.  204 A.D.3d at 145.  Similarly, Cadaret became immediately responsible for its clients' funds when they were held in Cadaret brokerage accounts—an obligation that arose <u>not from any third-party adjudication of liability</u> but from Cadaret's regulatory and contractual duties as a broker-dealer with a fiduciary-like obligation to protect and hold those funds.[17]  As in *MF Global*, Cadaret's fiduciary-like supervisory obligations were breached when client assets under Cadaret's control and management were stolen by Cadaret's registered representative.

Moreover, GAIC's suggestion that *MF Global* is merely "a datum for ascertaining state law" that this Court may disregard is unavailing. The First Department is controlling authority on questions of New York law, and as a federal court hearing a state law dispute under its diversity jurisdiction, this Court is obligated to apply it.  *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 4727 (1996) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law").  *See also In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S.*

---

[16] JA421-JA422 (Taylor Dep. Tr.), at 20:21-21:3; JA53 (Cohen Dep. Tr.), at 46:10-15; JA55-JA57 (Cohen Dep. Tr.), at 61:18-63:14; JA88 (Rothschild Statement of Claim); JA550-JA551 (Guilty Plea Tr.), at 21:18-22:6.

[17] *See* JA1136-1142 (Zagaro Statement of Claim Exhibit B – Account Agreement).  The account agreements named Pagartanis as the client's "Investment Professional" and were signed on behalf of Cadaret.  JA1142 (New Account Form).

*Dist. Asbestos Litig.)*, 971 F.2d 831, 850 (2d Cir. 1992) ("Where the high court has not spoken, the best indicators of how it would decide are often the decisions of lower state courts"). Indeed, *MF Global* expressly reaffirmed and refined the New York Court of Appeal's framework of *175 E. 74th Corp.*, holding that the distinction between covered direct losses and uncovered third-party liability turns on the specific facts of the case—not on the categorical rule GAIC asserts. 204 A.D.3d at 149. Here, the facts establish that Cadaret suffered a direct loss covered under the Bond or, at least, presented a material factual dispute if it did that could not be decided on summary judgment.

### 4. Cadaret's Position is Supported by Authoritative Insurance Treatises.

Not only does binding New York precedent support Cadaret's position that its direct loss arising out of Pagartanis' criminal dishonest conduct is covered under the Bond, but also GAIC has not successfully rebutted that authoritative insurance treatises uniformly state that bonds may and, in fact, do provide coverage for the loss of a third party's funds or property while in the possession of the policyholder under appropriate facts like those in *MF Global* and here. *See* Appellant Brief (Dkt 16.1) at 21-22 ("Appellant Br."). GAIC's attempt to characterize the transfer of funds as exclusively occurring from customer's personal accounts to sham accounts controlled by Pagartanis qualifies as a tacit admission that GAIC understands the clear problem it faces when trying to reconcile the actual underlying facts of this

case with its distorted and overstated legal position. However, the indisputable facts are that customers transferred funds from Cadaret accounts at the direction of and to Pagartanis. Thus, Pagartanis stole these client funds while they were in Cadaret's control and possession, thereby causing a direct loss to be incurred by his principal, Cadaret.

> 10 New Appleman on Insurance Law Library Edition § 111.01[f] states
>
> The requirement of direct loss may also implicate the question of coverage for the insured's liability to third parties. The bond may provide coverage in certain circumstances for the loss of a third party's funds or property while in the possession of the insured.

Cadaret's responsibility for the client funds goes beyond legal liability due to third-party claims, as Pagartanis stole client funds that were in the possession, custody and control of Cadaret. Despite GAIC's attempt to state otherwise, no treatise disputes that this loss is a direct one covered under a financial institution bond. In fact, the Appleman treatise clearly distinguishes between consequential loss to a third party from the loss of property while held by the policyholder (that would not be covered by a financial institution bond like the ruling in *175 E. 74th St. Corp.*) and the loss of the third party's property itself (that may be covered by a financial institution bond):

> [L]oss [of a third party's funds or property while in the possession of the insured] can only be recovered by the insured even if ultimately for the benefit of another. Also, the bond does not provide coverage for any consequential loss to the third party stemming from the loss of its property while held by the insured. That liability would be the insured's

- 13 -

alone; only the direct loss of the property would potentially be covered by the bond.

10 New Appleman on Insurance Law Library Edition § 111.01 (2026).

It is also telling that in a case with the same exact fact pattern as here, *Ogilvie Security Advisors Corporation v. Federal Insurance Company*, No. 11 C 8554, 2013 U.S. Dist. LEXIS 209478, at *2 (N.D. Ill. Nov. 18, 2023), the court rejected the same argument that GAIC raises in holding that the broker-dealer suffered a direct loss covered under its financial institution bond. This case also concerned a registered representative who misappropriated funds given to him by the broker-dealer's clients for investment. However, the district court ignored this ruling and GAIC's meager attempts to distinguish the case fail. GAIC contends that because "Cadaret's customers [ ] transferr[ed] funds *from* Cadaret accounts to their own outside accounts," "the customers could not have believed they were transferring funds to Caderet." However, this is not a meaningful distinction as Cadaret's customers transferred the funds to Cadaret's registered representative, Pagartanis, just like the clients in *Ogilvie* transferred their funds to Ogilvie's registered representative. Nor has GAIC cited to a case with similar facts holding the opposite. Thus, GAIC's arguments also fall flat in light of *Ogilvie*, 2013 U.S. Dist. LEXIS 209478, at *2, which supports that Cadaret suffered a direct loss as a result of Pagartanis' dishonest conduct.

- 14 -

Similarly, a ruling by the United States Court of Appeals for the Sixth Circuit, *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265, 270 (6th Cir. 2012), also supports Cadaret's position. In *First Defiance*, a registered representative transferred client assets that were held in a custodian bank's individual accounts accessible to First Defiance's investment advisors into his own bank account. *Id.* 267-268. The Sixth Circuit held that the fidelity bond covered losses incurred by a financial institution in reimbursing clients for funds stolen by the employee who removed funds from bank accounts under the control of the bank just like Pagartanis did from Cadaret accounts here. 688 F.3d at 274. GAIC attempts to rely again on incorrect facts to distinguish *First Defiance* by arguing that "Cadaret did not have control over any of the accounts on which the relevant checks were drawn." GAIC Br. at 39. However, as the record citations above make clear, this distinction fails as Cadaret's customers withdrew funds from Cadaret accounts due to Pagartanis' criminal misrepresentations to them.

### 5. The Bond's "Resulting Directly From" Language Does Not Bar Coverage.

GAIC also inaccurately overemphasizes what it calls the "direct-loss causation standard," arguing that the phrase "resulting directly from" was specifically adopted to preclude all third-party coverage. GAIC Br. 22-24. Yet, GAIC's drawn-out discussion of the history and development of fidelity bond language is ineffective, as even under the most stringent reading of the "resulting

- 15 -

directly from" language, coverage attaches where, as here, the causal chain from employee dishonesty to the policyholder's loss is immediate and direct. Moreover, the fact that FINRA may have discussed whether broker-dealers should procure "errors and omissions insurance policies or other kinds of coverage" (GAIC Br. at 29) does not detract from the purpose of fidelity bonds to insure losses resulting from employee dishonesty. This case does not concern losses from Cadaret's errors and omissions, but those directly resulting from Pagartanis' dishonest conduct. Pagartanis' scheme was designed to and did misappropriate assets directly from Cadaret's customer accounts.[18] The loss Cadaret suffered was the direct and foreseeable consequence of Pagartanis' thefts of funds out of Cadaret accounts as Pagartanis himself admitted he knew would happen[19] — not the product of an attenuated chain of causation. Moreover, given that the rule of *contra proferentem* applies here, if there is any lack of clarity in the meaning of this phrase, the provision should be construed in Cadaret's favor and against that of the drafter, GAIC. *Dean,* 19 N.Y.3d at 708 ("[a]ny ambiguities are construed against the insurance company and in favor of coverage").

---

[18] JA421-JA422 (Taylor Dep. Tr.), at 20:21-21:3; JA53 (Cohen Dep. Tr.), at 46:10-15; JA55-JA57 (Cohen Dep. Tr.), at 61:18-63:14; JA88 (Rothschild Statement of Claim); JA550-JA551 (Guilty Plea Tr.), at 21:18-22:6.

[19] JA550-JA551 (Guilty Plea Tr.), at 21:11-22:6; JA552 (Guilty Plea Tr.), at 23:5-25; JA546-JA547 (Guilty Plea Tr.), at 17:18-18:15; JA588 (Sentencing Memorandum).

GAIC wrongly analogizes this case to *Aetna Casualty & Surety Company v. Kidder, Peabody & Co. Inc.,* 246 A.D.2d 202, 212 (1st Dep't 1998), where the court found an insufficiently direct causal chain where "the employee's dishonesty only caused pricing irregularities in the stock," which caused losses to customers. In that case, the court ruled that there was an "attenuated chain" of events because the employee's misconduct caused pricing irregularities in the stock, which led to losses to the investors, which led to litigation and settlement years after the employee's misconduct. Thus, the loss was the result of pricing irregularities in stock and not the loss of the stock itself. The employee dishonesty here is clearly distinguishable because it did not merely cause some loss in value to the misappropriated funds beyond the funds' actual value, but directly caused a loss to Cadaret in the actual amount of the funds stolen.

The district court's characterization of the causal chain as similarly "protracted" ignores that from the moment Pagartanis orchestrated the taking of funds from Cadaret accounts, Cadaret suffered a loss itself as the fiduciary-like party responsible for the funds.[20] Pagartanis was stealing from Cadaret **and** Cadaret's customers. Cadaret's Loss was not dependent on the market forces that the *Kidder, Peabody* court noted in holding that the chain of causation in that case was too attenuated. Cadaret's loss existed the moment its customer's funds were

---

[20] *See* JA1136-1142 (Zagaro Statement of Claim Exhibit B – Account Agreement).

misappropriated out of Cadaret's accounts. That immediate loss is covered as a direct result of Pagartanis' dishonest conduct. *MF Global*, 204 A.D.3d at 153.

### 6. Cadaret Satisfies the Manifest Intent Requirement.

GAIC further argues that Pagartanis did not act with the "manifest intent … to cause the Insured to sustain such loss" because his scheme was directed at customers rather than Cadaret. GAIC Br. 34-35. This argument ignores the applicable legal standard, as well as the undisputed facts here. As this Court held in *F.D.I.C. v. Nat'l Union Fire Ins. Co.*, 205 F.3d 66, 71 (2d Cir. 2000), manifest intent "can exist when a particular result is substantially certain to follow from the employee's conduct" and "does not require that the employee actively wish for or desire a particular result." In fact, "[m]anifest intent to cause a loss may be inferred from an employee's reckless conduct and other circumstantial evidence." *Id.* Pagartanis, a registered representative operating under Cadaret's name and supervisory umbrella, ran a Ponzi scheme targeting *Cadaret's* customers. It was substantially certain that when the scheme unraveled, Cadaret—the supervisory broker-dealer with a fiduciary duty to its customers—would bear the financial consequences. Alternatively, at the very least, a factual dispute as to whether Pagartanis had the manifest intent to cause Cadaret to sustain a loss existed on this record.

GAIC cannot dispute that courts have consistently acknowledged that it is a fact that Ponzi schemes eventually collapse, and the "Ponzi scheme operator knows that the scheme will collapse." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 610 B.R. 197, 233 (Bankr. S.D.N.Y. 2019). Moreover, Pagartanis' note to family members— "Do not offer to pay anyone, let the broker dealers deal with it"— evidences that Pagartanis understood Cadaret would bear the loss when his scheme eventually collapsed.[21] The undisputed facts reveal that Pagartanis knew and confirmed to his family that in taking money from Cadaret's customers and their accounts that Cadaret would ultimately be responsible when the scheme collapsed.

GAIC's corporate designee also testified that GAIC was not aware of any facts that would contradict the Government's representation that Pagartanis penned the note.[22] Moreover, the Government's recitation of Pagartanis' note in the sentencing memorandum is particularly trustworthy because there was no incentive for the

---

[21] JA588 (Sentencing Memorandum). GAIC's evidentiary objections to the Government's sentencing memorandum, in which Pagartanis' statement appears, are also without merit as the memorandum is a public judicial record, and its contents are properly before this Court. This Court may take judicial notice of the sentencing memorandum, as it is part of the public record and was central to the sentencing that was handed down, and, thus, its accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b); *Richardson v. N.Y.C. Board of Ed.*, 711 F. App'x 11, 13 (2d Cir. 2017) ("Courts may judicially notice facts that are 'not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"); *Paskar v. City of N.Y.*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) ("Official government reports and other types of government records are appropriate for judicial notice."); *B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284, 285 (S.D.N.Y. 2004) (taking judicial notice of various documents from a criminal case brought by the United States against defendant's employee).

[22] JA488 (Szary 30(b)(6) Dep. Tr.), at 96:22-97:8.

Government to have exaggerated its contents, as it was listed as an example of a "self-pitying note" written by Pagartanis, among other similar notes.[23] Ultimately, however, Cadaret has satisfied the manifest intent requirement irrespective of whether the Court considers Pagartanis' note, based on the well-established nature of a Ponzi scheme and the fact that Pagartanis carried out the scheme by taking money from Cadaret's customers and Cadaret's customers' accounts, clearly intending for Cadaret to sustain any losses in taking advantage of its platform and customer relationships.[24] These facts either prove Pagartanis' manifest intent or create a factual dispute for the jury to decide, not the district court.

### 7. The Stolen Funds Were Covered Property.

GAIC argues that the funds were not "covered property" because they were not in Cadaret's possession at the moment Pagartanis negotiated checks drawn on the customers' outside accounts. GAIC Br. at 39-41. This argument misconstrues the facts, as discussed above, and also improperly narrows the relevant time frame and ignores that the scheme began with the liquidation of assets held in Cadaret brokerage accounts and ended with the illicit deposit of customer funds into accounts

---

[23] JA587 (Sentencing Memorandum).
[24] JA552 (Guilty Plea Tr.), at 23:5-25.

Pagartanis controlled.[25]  At the critical initial stage, the funds were indisputably held by Cadaret.[26]

The Bond covers property "held by the Insured in any capacity" or "owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss."[27]  Cadaret was responsible for these funds by virtue of its broker-dealer relationship with the customers set forth in the customer account agreements, *see, e.g.,* JA1136-1142 (Cadaret account agreement), and Pagartanis' authority to act as Cadaret's agent in requesting and accepting funds from clients. That Pagartanis directed the customers to take interim steps—transferring funds to outside accounts before writing checks to sham entities—does not eliminate Cadaret's responsibility for property that originated in its custody and was misappropriated through the acts of its own agent.  *See First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.3d 265, 270 (6th Cir. 2012) (acknowledging that held "in any capacity" is a "modest requirement."); *Ogilvie Security Advisors Corp. v. Federal Insurance Company*, No. 11 C 8554, 2013 U.S.

---

[25] JA421-JA422 (Taylor Dep. Tr.), at 20:21-21:3; JA53 (Cohen Dep. Tr.), at 46:10-15; JA55-JA57 (Cohen Dep. Tr.), at 61:18-63:14; JA88 (Rothschild Statement of Claim); JA550-JA551 (Guilty Plea Tr.), at 21:18-22:6.

[26] The non-binding cases from other jurisdictions that GAIC cites, *RealPage, Inc. v. Nat'l Union Fire Ins. Co.*, 21 F.4th 294 (5th Cir. 2021), *Lynch Properties Inc. v. Potomac Insurance Co. of Illinois,* 140 F.3d 622 (5th Cir. 1998) and *Loeb Props. v. Fed. Ins. Co.*, 663 F. Supp. 2d 640 (W.D. Tenn. 2009) are distinguishable because the policyholder in those cases never had responsibility for the stolen property and the stolen property was not from their own accounts, whereas property was stolen here from Cadaret accounts.

[27] JA449 (Bond).

Dist. LEXIS 209478, at *2 (N.D. Ill. Nov. 18, 2023) (holding "when the clients placed their checks into [the defalcating representative's] hands for investing, it was the same as placing the funds directly into [the insured's] hands," thus satisfying the Bond's covered property definition).

The significance of this error by the district court is that Cadaret's customers' accounts were held by Cadaret, and thus the loss from Pagartanis' misconduct is squarely covered under the Bond.

### 8. No Exclusions Bar Coverage for Cadaret's Loss.

"[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." *Dean*, 19 N.Y.3d at 708. GAIC has failed to demonstrate that any exclusion in the Bond applies, or it has failed to demonstrate that there is no other reasonable interpretation that differs from its interpretation. As such, GAIC's contention that these exclusions preclude Cadaret's claim should be rejected.

### a. Exclusion 2(t) Does Not Bar Coverage.

GAIC argues, and the district court incorrectly held, that Exclusion 2(t), which excludes "damages of any type for which the Insured is legally liable" applies to bar Cadaret's claim.[28] That exclusion, though, contains a critical exception that it does

---

[28] GAIC Br. 43-45; SA1 (District Court Memorandum and Order) at 13-14.

not apply where "the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages." This exception applies here. Pagartanis' scheme caused Cadaret's customers to lose assets under Cadaret's control and management. Given that Cadaret held those funds in trust for its customers, Pagartanis' criminal actions stealing funds out of the customers' Cadaret brokerage accounts caused Cadaret a covered loss.[29] Cadaret's obligation to replace the stolen funds was not contingent upon a damages award; it arose from Cadaret's contractual and fiduciary duties to its customers the moment the funds were misappropriated.

GAIC dismisses this reasoning as "circular," but its own reading of Exclusion 2(t) would render the exception a nullity. *Givati v. Air Techniques, Inc.*, 104 A.D.3d 644, 645 (2d Dep't 2013) (a "court should not read a contract so as to render any terms, phrase, or provision meaningless or superfluous"). If any loss that also gives rise to third-party damages is excluded, and the exception can never be invoked because the loss is always "dependent upon the existence of damages," then the exception would be illusory. New York law requires that insurance provisions be interpreted to "leave[] no provision without force and effect." *In re Viking Pump,*

---

[29] *See, e.g., Janney Montgomery Scott*, 2019 Phila. Ct. Com. Pl. LEXIS 9, at *2 (holding that since the bondholder "proffered some evidence that the clients' stolen investment funds may constitute a covered loss to [the bondholder]," the court could not conclude that this same exclusion bars coverage and noted the facts supported coverage under the bond).

*Inc.*, 52 N.E.3d 1144, 1151 (N.Y. 2016). GAIC's unreasonable interpretation violates that principle, and its overreaching interpretation should be rejected. At a minimum, the interpretation advanced by Cadaret is reasonable, which defeats GAIC's reliance on this exclusion.

### b. Exclusion 2(i) Does Not Bar Coverage.

As a threshold matter, the district court did not rule on GAIC's arguments relating to exclusion 2(i), so this Court should not address this argument. *Zappulla*, 636 Fed. Appx. at 825 (this Court "generally will not review an issue the district court did not decide"). However, even if the Court were to consider this argument, exclusion 2(i) does not apply.

GAIC incorrectly asserts that exclusion 2(i), which excludes "loss resulting directly or indirectly from transactions in a customer's account" but contains an exception for "the unlawful withdrawal and conversion of Money [ ] directly from a customer's account by an employee," bars coverage for Cadaret's Loss. In short, GAIC again ignores the exception to the exclusion.

This exclusion does not apply because Pagartanis' scheme involved the "unlawful withdrawal and conversion of Money [ ] directly from a customer's account by an employee."[30] Pagartanis fraudulently convinced clients to withdraw monies directly from their Cadaret accounts so that he could unlawfully gain control

---

[30] JA443 (Bond).

- 24 -

of their money.[31] This constitutes an "unlawful withdrawal and conversion" of client money by Pagartanis. The clients' participation in the withdrawal does not alter that the withdrawal was unlawful and effectuated by Pagartanis' criminal conduct. Thus, Exclusion 2(i) does not bar coverage for Cadaret's Loss.

Moreover, the Bond does not define the term "transactions" and GAIC's overbroad interpretation of the exclusion to exclude the withdrawal of funds by Cadaret customers from their Cadaret accounts is inconsistent with other sections of the Bond, such as Insuring Agreement D. *See Rothschild Inv. Corp. v. Travelers Cas. & Sur. Co. of Am*., No. 05 C 3041, 2006 U.S. Dist. LEXIS 30033 at *19 (N.D. Ill. May 4, 2006) (finding insurance company's broad construction of "transaction" would impermissibly vitiate coverage and concluding that the exclusion was ambiguous and must be construed against the insurance company). In *Rothschild Inv. Corp.,* the court rejected the overbroad interpretation of exclusion 2(i) because it was inconsistent with the other provisions of the bond that covered losses where the insured transfers, pays or delivers funds based on forged instructions. *Id.*

Similarly, GAIC has not and cannot meet its burden of proving this exclusion applies to *all* transactions. Accordingly, exclusion 2(i) does not bar coverage for all

---

[31] JA421-JA422 (Taylor Dep. Tr.), at 20:21-21:3; JA53 (Cohen Dep. Tr.), at 46:10-15; JA55-JA57 (Cohen Dep. Tr.), at 61:18-63:14; JA88 (Rothschild Statement of Claim); JA550-JA551 (Guilty Plea Tr.), at 21:18-22:6.

transactions in a customer's account, let alone withdrawals at the direction of an insured's registered representative.

### 9. GAIC's Alternative Grounds Are Without Merit.

In addition to the reasons cited in Cadaret's opening brief, the Court need not address GAIC's alternative arguments that (1) the Bond terminated prior to 2018, (2) Cadaret discovered the Loss prior to 2018, (3) Cadaret did not comply with Section 5 of the Bond, and (4) Cadaret's complaint is time-barred. It is well-settled law in this Circuit that this Court will not rule upon issues raised on appeal that the district court has not previously considered and addressed.[32] *Zappulla*, 636 Fed. Appx. at 825.

In the event the Court chooses to consider these arguments, GAIC's claim that the Bond terminated and Cadaret discovered Pagartanis' scheme in 2017 fails. While Cadaret received a claim from a former customer, Jennifer Abramovich, in March 2017, this claim did not provide sufficient detail for Cadaret to know what Ms. Abromovich was claiming.[33] Abramovich's claim did not allege that she had sustained a net financial loss, but only that Pagartanis had sold products or financial services that were not approved by Cadaret.[34] In fact, Ms. Abramovich made a substantial profit, unlike Cadaret's clients who later brought claims regarding

---

[32] In the event the Court considers these arguments, Cadaret addresses these points on pages 47 to 54 of its Opening Brief.

[33] JA525-JA526 (Cohen Dep. Tr.), at 134:10-19; 136:5-9.

[34] JA342-JA343 (Pagartanis Answer to Abramovich Statement of Claim).

Pagartanis' misappropriation of their funds.[35]   Cadaret's investigation into Ms. Abramovich's claim alleging distinct "selling away" activities did not cause Cadaret to discover Pagartanis' scheme, which it discovered a year later when the claims at issue here began to be filed in the spring of 2018.[36]

In March 2017, Cadaret contacted Pagartanis' other clients by letter and did not receive any responses until it received the Client Claims.[37]   GAIC's assertions that Cadaret failed to provide timely notice and a proof of loss under the Bond, and Cadaret's complaint is time-barred, also fail because they depend entirely on GAIC's contention that Cadaret discovered the Loss in May 2017, which it did not.   At a minimum, these issues involve several factual disputes that are not properly resolved on summary judgment, and should be left for resolution by the fact-finder on remand.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's entry of summary judgment in favor of GAIC and denying Cadaret's motion for partial summary judgment.   Alternatively, at a minimum, the Court should determine that there are genuine issues of material fact that preclude summary judgment, and

---

[35] *Id.*

[36] JA319 (Jaynes Dep. Tr.), at 65:14-18; JA320 (Jaynes Dep. Tr.), at 66:2-11.

[37] JA318-JA319 (Jaynes Dep. Tr.), at 64:20-65:8.

remand the case for further proceedings below.


Dated:  April 17, 2026                    _____*/s/ John N. Ellison*_____
John N. Ellison
REED SMITH LLP
599 Lexington Avenue
22nd Fl.
New York, NY 10022
Tel.: (212) 521-5400
Fax: (212) 521-5450
jellison@reedsmith.com

*Counsel for Appellant,*
*Cadaret, Grant & Co., Inc.*

- 28 -

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 6,983 words, excluding the parts of the brief exempted by Local Rule 32.1(a)(4)(A) and Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

2.      This brief complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a 14-point proportionally-spaced serif font.


 Dated:  April 17, 2026                              */s/ John N. Ellison*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing document to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  April 17, 2026                    _____*/s/ John N. Ellison*_

- 1 -